WAIT *vs.* WAIT.

A woman who has obtained a decree for a divorce *a vinculo matrimonii*, for the adultery of her husband, is not, after his death, entitled to dower in his real estate.  WILLARD, J. dissented.

EJECTMENT for dower, tried at the Saratoga circuit in November, 1847, before Justice A. C. PAIGE.   Joseph Wait died in 1845.   On the 25th of November, 1825, the plaintiff obtained in the court of chancery of this state a decree of divorce against the said Joseph Wait for adultery committed by him.   The following is a copy of that decree.   " This cause having been brought on this day to be heard upon the equity reserved, and for further directions upon the report of George W. Kirtland, Esq., one of the masters of this court, bearing date the 31st day of October last past, and upon the proofs taken before him pursuant to an order heretofore made in this cause, and a written stipulation between the parties to this suit, (the complainant's bill of complaint having been taken as confessed against the defendant,) on reading said proofs and the report and the opinion of said master upon such proofs, whereby it appears that the fact of the adultery charged by the complainant in said bill is fully and satisfactorily established, and on motion of Mr. Samuel M. Hopkins, of counsel for the complainant, it is adjudged and decreed that the said report stand confirmed.   That

Wait *v.* Wait.

the marriage between the said complainant Lydia Wait and the said defendant Joseph Wait be dissolved, and the same is dissolved accordingly, and the said parties, and each of them, are, and is, hereby freed from the obligations thereof. And it is further adjudged and decreed that the said complainant do recover against the said defendant her costs to be taxed, and that the complainant have execution thereof."

It was further proved that prior to the divorce, in 1825, and while the plaintiff was the wife of Joseph Wait, he was seised of the premises of which the plaintiff now claims dower. After the divorce, Wait gave a bond and mortgage to secure the payment to the plaintiff of $30 per annum, during her life, which sum he regularly paid until his death. A witness swore that Joseph and Lydia Wait submitted the question of what he should pay in lieu of dower, to him and another, and they awarded $30 per year ; but the submission and award were by parol. The defendant endeavored to show a release of dower, claimed to have been given at the time the bond and mortgage were given, but that was not sufficiently proved in the opinion of the justice holding the circuit. The judge directed a verdict for the plaintiff, and the defendant having taken exceptions, now moved for a new trial.

*J. K. Porter*, for the defendant. I. The plaintiff was barred from the recovery of dower by the divorce *a vinculo*, and dissolution of the marriage contract between her and Joseph Wait. The divorce for adultery, at common law, was only a divorce *a mensa*, which did not sever the marriage contract, and *for that reason* did not bar dower. (1 *Cru. Dig.* 138, 9.) By the statute of 13 Edw. 1, ch. 34, the common law rule was modified, but only to a limited extent. The wife who eloped and continued with the adulterer, though not divorced, was barred of dower on conviction, except in cases of condonation. That statute was substantially re-enacted by us in the old act of 1787. (1 *R. L.* 58, § 7.) But a divorce *a vinculo*—the remedy given by our subsequent statutes in cases of adultery— always barred dower. "She must be the actual wife of the

party *at the time of his decease.* If she be divorced *a vinculo matrimonii,* she shall not be endowed, for *ubi nullum matrimonium ubi nulla dos.* (*Bracton, Book 2, ch.* 39, § 4.) But a divorce *a mensa et thoro* only, doth not destroy dower, no, not even for adultery itself by the common law." (2 *Black.* 130. 1 *Chitty's Black.* 103, *vol.* 2.) In *Reynolds* v. *Reynolds,* (24 *Wend.* 193, 196,) Bronson, C. J. says: "As to divorce *a vinculo, that always put an end to dower;* for although it was not necessary that the seisin of the husband should continue during the coverture, it *was* necessary that the marriage should continue until the death of the husband." It is only "the widow" who is endowed. The marriage bond being severed before his death, she is not his widow." (1 *R. S.* 740, § 1. 2 *Id.* 26, § 1, *3d ed.* 1 *R. L.* 56, § 1.) The rule of the common law that a divorce *a vinculo* bars dower remains in full force. By the revised laws, the adultery of either party, on the application of the other, will be followed by a divorce *a vinculo.* (*Act of* 1813. 2 *R. L.* 198, §4.) By the first section a party may apply for divorce and other relief, *or* for divorce only. By section 5, the court may make further decree for the support of the applicant and her children. The 6th section reserves her right to property she brought with her at her marriage, if she be complainant. By the 7th section, the husband, if complainant, may keep the property the wife brought. By the 8th section, a wife convicted of adultery shall not be entitled to dower or inheritance. This, it will be perceived, reaches those cases where the fact of adultery is proven, but where no divorce can be obtained by reason of condonation. The 4th section provides for divorce *a vinculo,* and dissolution of the marriage contract; but contains a saving clause for the legitimacy of the children. It authorizes the remarriage of the complainant, but prohibits the remarriage of the defendant. These reservations were necessary; without them, the marriage being dissolved, the children would be illegitimate, and the defendant could remarry and not be guilty of bigamy. In the section regulating the character of the divorce, there are no other penalties, no other reservations. If entitled to dower, the wife is entitled to distribution

in case of intestacy; for both are incident to the marriage contract, and neither is reserved on its dissolution. She loses dower, but she obtains an indemnity if she asks it, under the 5th section, in a permanent provision for her support, to be secured by the husband under penalty of the sequestration of his estate. (2 *R. L.* 199, § 5.) The 8th section is purely *penal*, and applies to the case of *the wife's conviction* of adultery. It probably applied only to cases of guilt proved, in which cases, by reason of condonation, no divorce could be granted. If intended for cases of divorce, it was unnecessary; for under the common law a divorce *a vinculo* always extinguished dower. The legislature in that case had overlooked the legal effects of the change in the nature of the divorce, and desirous to retain the wholesome restraint of the statute of Edward, and the act of 1787, re-enacted substantially the penalty of the old law. The legislature could, if they had chosen, have imposed the penalty of the Massachusetts law upon the husband in lieu of the permanent provision for her support. There the act authorizing the divorce for adultery of the husband, provides that she " shall be entitled to her dower in his lands in the same manner as if he was dead." (*R. S. of Mass.* 483, § 32. *Laws of* 1785, *ch.* 69, § 5. 13 *Mass. Rep.* 231.) But the penalties of our statute were sufficiently severe upon the husband. These were, the expenses of the proceedings; restitution of the wife's former property; security for the support of the children; a permanent provision for the support of the wife, if sought by the bill, or by subsequent application; and a prohibition of remarriage. These were the only penalties and reservations in the law of 1813, under which this divorce was obtained, and by which this case is to be governed. Similar provisions, with various modifications, are contained in the revised statutes. (2 *R. S.* 144, §§ 38 *to* 49, 1*st ed.* *Id.* 204, §§ 37 *to* 48, 3*d ed.*) Two sections are substituted in the revised statutes for the 8th section in 2 *R. L.* 199; and the two are substantially alike. (1 *R. S.* 741, § 8, 3*d ed.* 2 *Id.* 27, § 8. *Id.* 146, § 48, 3*d ed.* *Id.* 205, § 47.) The one under head of " *dower,*" the other of " *divorce.*" These provisions may perhaps be unnecessary, as well as that for

which they are a substitute, but they cannot change, by implication, the effects of a divorce *a vinculo.* A statute inflicting a penalty upon the wife cannot be construed as imposing another penalty, in a different case, upon a guilty husband. (2 *John.* 379. 6 *Cowen,* 567.) A penal statute cannot be distorted by implication into a remedial statute in another case, and in derogation of the common law. Chancellor Kent, in commenting on these provisions says : " In case of a divorce *a vinculo,* dower would cease of course, and no such statute provision was necessary." " As the law always stood, if the doweress was not the wife at the death of the husband, her claim of dower fell to the ground." (4 *Kent's Com.* 53, *note c.*) He alludes also to the difference between New-York and the other states, in barring dower only by divorce, instead of *plea of elopement.* (*Id.* 53.) " But in case of such a divorce (*a vinculo*) for the adultery of the husband, it is provided by the statute law of those states which authorize the divorce, that a right of dower shall be preserved, *or* a reasonable *provision* be made for the wife out of the husband's estate, by way of indemnity for *loss of her dower* and of her husband's protection." (*Id.* 54.) Chief Justice Bronson says, referring to this provision, " The 8th section of the act of 1830, (1 *R. S.* 741,) has added nothing to the law as it would have stood, had the legislature stopped with the repeal of the act of 1787." . (*Reynolds* v. *Reynolds,* 24 *Wend.* 196.) It was for the widow in this case to *elect* whether she would take the remedy of a divorce *a vinculo,* with its legal consequences, or not. She made her election, and is bound by it. (*See also remarks of McCoun, V. C., in Day* v. *West,* 2 *Edw. Ch. Rep.* 596.) The provision of the revised statutes cited against us on a former occasion, (1 *R. S.* 742, § 16 ; 2 *Id.* 28, § 16, 3*d ed.,*) has no application to this question. This was not then the law. The plaintiff was not the wife of the decedent at his death, and was not " otherwise entitled thereto." The provision was to protect the wife from the decrees of third persons, not from her own decrees. The plaintiff entirely misconceives the provision, as will be seen by refer-

ence to the two old sections from which it is framed. (2 *Caines*, 143. 4 *John.* 159. 2 *R. L. p.* 57, § 4 ; *p.* 59, § 10.)

II. The evidence of the agreement by the plaintiff to receive the provision in lieu of dower, should not have been excluded. The objection came too late after a full examination as to its contents, without objection. The objection could not be sustained after the examination by the plaintiff's counsel of Mr. Kirtland and the defendant, as to its contents. The paper was traced to Mr. Kirtland, and not traced out of him : he made faithful search and was unable to find it. The defendant swore to its loss, and it was conceded that there was nothing to warrant any presumption of bad faith. Even if assumed to have been in the hands of Mr. Given, that fact was not known to the defendant, and due diligence was used to ascertain what had become of it.

III. The exceptions of the defendant were well taken to the decision on the motion for a nonsuit, and the refusals to charge and the direction to find a verdict for plaintiff. The submission and award, and the mutual assent of the parties, (even without regard to the agreement made in pursuance of it,) should have estopped the plaintiff, if the jury believed the evidence of the witness Hubbs. At any rate, she should have been held estopped by these facts, followed up by her acceptance of the provision and receipt of the money. The jury had a right to presume a release of dower, from the divorce in 1825, the lapse of time, the provision made for the plaintiff, and the other undisputed facts disclosed by the evidence. (*Evans* v. *Evans*, 3 *Yeates*, 507. *Deshler* v. *Beers*, 4 *Dallas*, 300.)

*E. F. Bullard*, for the plaintiff. I. A divorce *a vinculo* is only granted for a cause existing *previous* to the marriage. In such cases the *contract* is declared void. In fact the parties not being capable of contracting, the marriage is void *ab initio*, and the court pronounce accordingly what the law already declared. (3 *Black. Com.* 94. 1 *Id.* 440. 2 *R. S.* 142. 4 *Kent*, 104.) II. At common law, and by statute, for all causes arising subsequent to the marriage, adultery, &c. the parties are merely

separated *a mensa et thoro.* In such cases the wife retains her dower if she be not the guilty party. III. A *special* divorce is granted under the statute, (2 *R. S.* 144,) which is not included within either of the above definitions, whereby the court may "*dissolve*" the marriage for adultery; but in this case the *contract* is not declared *void.* The moment the lawful marriage took place, dower attached to the husband's real estate ; (4 *Kent,* 50 ;) and in giving the wife further reparation or relief under this statute, for the wrong of the husband, the legislature never intended to bar her of the dower which she formerly retained under like circumstances at the common law. (1 *R. S.* 742, §§ 16, 8. 2 *Denio,* 430. 2 *R. S.* 146, § 48. 10 *Paige,* 20. 4 *Kent,* 54.) IV. The loss of the pretended agreement or release was not proved ; and no sufficient search made. V. The term " widow," used in the statute, does not alter the common law, which gave dower to a " woman" whose husband was seised, &c. (2 *Hill,* 380.) VI. By the revised statutes, (1 *R. S.* 742, § 16,) " no *decree* recovered against him, and no laches, default, covin, or crime of the husband, shall prejudice the right of his wife," &c. We submit this section covers the decree in this suit, in spirit, if not in terms. VII. If section 38, (2 *R. S.* 144,) with a decree, barred dower, section 48 was unnecessary. If the dissolution barred dower, the forfeiture by section 48 need not have been given. The wife could not *forfeit* that which was already barred, and therefore in order to bar her, for her wrong, section 48 was necessary.

*By the Court,* H<small>AND</small>, J. This case presents the distinct question, whether, after a dissolution of the marriage by a decree of the court of chancery of this state, for the adultery of the husband, the complainant in that suit, after the death of the defendant, can have dower of the lands of which he was seised during coverture ? It is believed that this is the first time this question has directly arisen in this state, and as it is of some importance, it calls for all due consideration. Eminent men, as we shall see in our examination of authorities, have

thrown out suggestions; but I am not aware the point has been directly adjudged in our courts.

The statute which authorized this divorce, after providing for exhibiting a bill, &c. in cases of adultery, reads as follows: "That if it shall satisfactorily appear to the court of chancery, either by the trial of such feigned issue or issues, or by the proofs taken and reported by the master aforesaid, that the defendant has been guilty of the adultery charged in the bill, it shall be lawful for the court to decree that the marriage between the parties shall be dissolved, and each party freed from the obligations thereof." (2 *R. L.* 198, § 4.) The same section saved the legitimacy of the children, and allowed the complainant to marry again, but prohibited the offender from so doing. The 5th section authorized the court, by a further decree or order, when the wife should be the complainant, to compel the defendant to provide for the maintenance of the children of the marriage, and also to provide such suitable allowance for the support of the complainant as to the court should seem just, according to the circumstances of the parties, and to give security therefor, and in default thereof to sequester his personal, and the rents and profits of his real estate, for that purpose. By the 6th section, the property of the wife, at the time of the decree, was restored to her. Section 8th barred dower if the wife were defendant. This act was passed April 13th, 1813, and was substantially a re-enactment, with some additional provisions, of the statute on this subject, passed March 30th, 1787, giving the power to the court of chancery to divorce *a vinculo* for adultery. (1 *K. & R.* 93. 2 *Kent,* 97.)

The history of the law of divorce for adultery is somewhat curious. The doctrine of the Roman Catholic Church is, that marriage, which with them has attained the dignity of a sacrament, is indissoluble. Though it seems this was not so at an early period. (*Macqueen Pr. of H. of L'ds,* 471, *n. g.* And see *Macqueen on Husband and Wife,* 199, 202, 203, 204.) Whatever might have been the practice before, and probably there was not perfect uniformity in Christendom, after the declaration of the council of Trent on the subject, in 1563, in

countries where that was the established religion, a divorce *a vinculo matrimonii* for adultery could not be granted. The same theory prevails in England. The English ecclesiastical courts dissolved the marriage for adultery, it is believed, as late as 1602; but no divorce *a vinculo* for that cause has been granted there by a judicial sentence since that period. While in Scotland, in all or nearly all the protestant states on the continent, and in all of these United States (South Carolina perhaps excepted) the proper judicatiories have exercised this power. We have seen that this has been done by authority of legislative enactment in this state, for more than sixty years. England seems to be the only protestant country where this judicial power does not exist. A proposition to change the existing law there, was brought forward in the time of Edward 6, under the auspices of Cranmer, (in 1551, 2,) but its progress was arrested by the death of the king. Parliament is therefore the only resource in such cases there; and that is slow to interfere, and as a general rule does so only when the wife is the offender, and after a sentence of separation in the ecclesiastical court, and a verdict for damages against the adulterer. (*Mackintosh's Hist. of Eng.* 272, 3. *Hallam's Const. Hist. of Eng.* 140. *Toml. Dict. Divorce. Dalrymple* v. *Dalrymple,* 2 *Haggard,* 45. *Edmonstone* v. *Edmonstone, Ferguson,* 168. *Commissary Gordon's opinion in Gordon* v. *Pye,* 3 *Eng. Eccl. R.* 431. *Rye* v. *Fuliambe, Moore,* 683. 2 *Kent,* 95 *et seq. Macqueen's House of L'ds,* 465. *Rex* v. *Lolley, Russ. & Ry.* 237. 1 *John. Ch. R.* 493. 2 *Burns' Eccl. L.* 457, 503.) In England, except by act of parliament, the power to dissolve the marriage is confined to causes pre-existing; some of which are considered civil disabilities and render the marriage void, as former marriage, &c.; and others called canonical (until a late act) rendered it voidable, as consanguinity, &c. And it has been said that the divorce *a vinculo* by judicial sentence is not so much a dissolution of the contract, as a declaration of its nullity *ab initio.* (*Bac. Abr. Marriage and Divorce, E.* 2 *Kent,* 95. 1 *Bl.* 440.)

Dower has varied in different ages and in different countries

Wait *v.* Wait.

in nature and extent; and although here and in England it has been pretty well understood for a long period, and is said to be favored in law, yet, unlike inherent rights, as life and liberty, it is the creature of positive law, and therefore subject to constant mutations. The law of dower varies in the several states, and was very much changed in England by the statute of 3 and 4 Wm. 4, chapter 105, (1833.) (*Macqueen's Husband and Wife, App.* 48.) Dower has been called an excrescence or continuance of the husband's estate. (9 *Vin.* 372, *pl.* 82. *Co. Litt.* 240, *b.*) "Dower," says an old writer, "by the law of the land, is a portion which a widow hath of lands of her husband, which by the common law is the third part of all the lands in fee simple or fee tail whereof the husband was sole seised at any time during coverture." (*Lill. Reg.* 664.) The statute, "an act concerning dower," which was in force when this decree was pronounced, passed in 1787, has no allusion to the estate in which dower may be claimed. But as the law then stood there must be an estate of inheritance, (1 *Cruise,* 151,) or, as Bacon has it, "such estate as the children by such wife might by possibility, have inherited," &c. (*Bac. Abr. Dower. Litt.* §§ 36, 53. 2 *Bl.* 132.) Our present statute is: " A widow shall be endowed with one-third part of all the lands whereof her husband was seised of an estate of inheritance at any time during marriage." (1 *R. S.* 740, § 1.) It also gives dower, or rights similar to dower, in certain equitable estates, (2 *R. S.* 112, § 71; *Id.* 374, § 64,) and perhaps in other cases. Wait died after the revised statutes took effect, and if the plaintiff's right of dower be controlled by them, (*see Reynolds* v. *Reynolds,* 24 *Wend.* 193,) yet it is believed there was thereby no change of the law affecting the question before us. It is the " widow" only who is entitled now as before. Nor does the section declaring no judgment or decree against the husband shall prejudice the right of the wife to dower, apply to decrees obtained by herself in her own favor. (1 *R. S.* 742, § 16.)

Whatever definition we may give to it, its object is well defined. "Dower, in the common law, is taken for that portion of the lands or tenements which the wife hath for term of

---

---

her life of the lands or tenements of her husband after his decease, for the sustenance of herself and the nurture and education of her children." (*Co. Lit.* 30, *b.*) And this is confirmed by all the elementary writers. (2 *Bl.* 130. 1 *Cruise*, 126. 4 *Kent*, 35. *Bac. Abr. Dower, A. Hargrave's note* (178) *to Co. Lit.* 30, *b.* 2 *P. Wms.* 702.) Indeed the early Saxons gave her no lands, but made direct provision for the support of the widow out of the goods of the husband. (2 *Bl.* 129. *Crabb's Hist. Eng. Law*, 83.) And afterwards she took land, but only during widowhood. (*Id. and* 1 *Cruise*, 130.)

Three things are necessary to the consummation of the widow's right of dower: "marriage, seisin, and death of her husband. (*Co. Lit.* 31, *a.* 1 *Cruise*, 136.) In the case under consideration, the marriage and seisin during coverture, I think were *prima facie* shown. But it is contended that the third requisite, the *death of the husband*, has not been shown; or rather that the intervening divorce of the parties prevents the consummation of the right. After a careful examination of the subject, I am inclined to think this objection valid, both upon principle and authority.

All the books concur in the rule that no dower is recoverable unless the marriage continues until the death of the husband. "But it is necessary that the marriage do continue, for if that be dissolved the dower ceaseth, *ubi nullum matrimonium ibi nulla dos.* But this is to be understood when the husband and wife are divorced, *a vinculo matrimonii* as in case of precontract, consanguinity, affinity, &c. and not a *mensa et thoro* as for adultery." (*Co. Lit.* 32, *a.*) But it is said that this does not apply where there has once been a valid marriage. It is true, as we have seen, that, at the time Coke wrote, divorces *a vinculo* by judicial sentence rendered the marriage invalid *ab initio*; but the language is general, that a divorce *a vinculo* takes away dower. In the cases of canonical disabilities, this divorce *dissolves* the marriage contract. The marriage was only voidable, and was valid until dissolved. And although the spiritual courts, for want of power, cannot divorce except for pre-existing causes, parliament can; and a dissolu-

tion by parliament of a marriage before perfectly valid, and for some supervenient cause, is nothing more than a divorce *a vinculo matrimonii*, and is so called. And the expression, " it is necessary that the marriage *do continue*, for if that be *dissolved* dower ceaseth," explains the author's meaning. It is the *dissolution* of the marriage contract that affects the right to dower. Parliament may dissolve to take effect from the passage of the act, (*extunc*) while the courts there have only power to do so for pre-existing causes; and therefore a divorce by them retro-acts; but both are a dissolution, (when not before void,) of a marriage valid for all purposes until dissolved ; and the only difference is in the time of the dissolution taking effect. Now Lord Coke does not say : " Where there *never has* been any marriage there is no dower." The language used by him, and which he took from Bracton, who wrote in the 13th century, (*Bract. lib.* 2, *fol.* 92,) may be considered as referring to the state or condition of matrimony or wedlock, not to the act of marriage.

The divorce in the case under consideration was in all respects similar to a divorce by parliament, except that our law, then, (and now,) prohibited the offender from marrying again during the life of the complainant ; which may be, but except in one instance, I believe, has not been done in England. And yet, I can find no instance on record, of dower being claimed after a parliamentary divorce there. Absence of adjudication is not conclusive evidence of the law, but raises an adverse presumption. (*Ram on Judg.* 156.) It is true that but three divorces on the prayer of the wife, have been granted; and the first was about 130 years (in 1801,) after parliament had settled the question of power and had divorced on the prayer of the husband. (*Macqueen H. of L.* 473, 475.) But as it has been settled for nearly half a century, that the wife may have relief by legislative interference in England, it is a little singular that this question had not been agitated if in truth the rule is that dower may be claimed after a dissolution of the marriage. Again ; when parliament grants a divorce it almost invariably requires the complainant to provide for the support of the guilty wife. (*Jee* v. *Thurlow,* 4 *D. & R.* 17. *S. C.* 2 *B. & C.*

Wait *v.* Wait.

548.) This would not be necessary, at least, after his decease, if she were entitled to dower and a distributive share of his estate ; for adultery at common law did not bar dower, nor does the statute of *Westm.* 2, (13 *Edw.* 1,) except where the wife elopes and tarries, &c. It has been said that dower in England was forfeited by a decree of separation for adultery. (1 *Rolle Abr.* 680. 1 *Cruise*, 140.) One author thinks this is only where she comes within the statute of Westm. 2. (*Bac. Abr. appendix, Dower.*) It is possible that a doubt has arisen from the fact that formerly the spiritual courts divorced *a vinculo* for adultery. Particularly as Coke and Rolle, who differ on this point, published within about 40 years of each other, (Coke in 1628, 1629, and Rolle soon after the restoration,) and as we have seen, divorces *a vinculo* for adultery were granted as late as 1602. (*And see Hargrave's note* 9, *to Co. Lit.* 32, *a.*)

But it is believed the terms used, the very language of the law, also clearly imply that the marriage must continue until the death of the husband. Dower may be said to have been established by Magna Charta (1215,) or at least to have obtained a permanent foundation by that charter and four others, viz : the first great charter of Henry 3d, (1216,) 2d do. (1217,) and 3d do. (1224,) and first do. of Ed. 1, (1297.) In all of these as well as in the preliminary articles of Magna Charta, the word " widow " is the only word used to designate the person entitled to dower. " No widow shall give any thing for her dower or marriage after the decease of her husband," &c. (*Articles of Mag. Char.* 4.) " A widow after the death of her husband, shall immediately and without difficulty, have her marriage, and her inheritance, nor shall she give any thing for her dower," &c. (*Mag. Charta, ch.* 7.) "A widow after the death of her husband, shall immediately and without difficulty, have her freedom of marriage and her inheritance; nor shall she give any thing for her dower," &c. (*First Great Charter of Hen.* 3, *ch.* 7.) Chapter 7 of the 2d and 3d great charters of Henry 3d begins in the very same words; and also chapter 7 of the great charter of Edward 1.

And the old forms of pleadings, unless she had again mar-

ried, used the term " widow." ( *Gerard* v. *Gerard, Lev. Ent.* 76. *Holmden* v. *Gregory, Lill. Ent.* 189. *Rastell's Ent.* 227.) And this was the word used in our statute in relation to dower, in force when the plaintiff obtained her decree ; the first section of which was pretty substantially the same as the 7th chapter of magna charta, except that the latter did not define the share the widow was to have. (1 *R. L.* 56. 7 *John.* 247.) Our revised statutes, which were in force when Wait died, also use it in giving dower, and require its use in the proceedings to recover it. " A widow shall be endowed," &c. (1 *R. S.* 740, § 1.) So in relation to ejectment : " By any widow entitled to dower, or by a woman so entitled and her husband," &c. (2 *Id.* 303, § 1.) The declaration states she was possessed of " one undivided third part of the premises as her reasonable dower as widow of her husband, naming him." (*Id.* 304, § 10.) Whenever a claimant of dower, not again married, is mentioned in our present statutes, this is the appellation given to her. The true meaning of the term " widow" is therefore important, and that meaning is familiar, well fixed and certain in this state and in England. It no doubt may literally mean a woman deprived of, or without a man. But the legal as well as the popular signification of the word, is that given by Webster : " A woman who has lost her husband by death. Luke 11." ( *Webster's Dict. last ed.* " *Widow.*") The etymology of the word implies that she has been *deprived* of a husband. The meaning of its correlative " widower" is equally familiar: " A man who has lost his wife by death " (*Id.*) The plaintiff is not the widow of Wait. A dissolution of the marriage, and subsequent death cannot make a widow. She lost no husband, by his death. She was not his wife when that event happened. A wife, Webster says, is " the lawful consort of a man ; a woman who is united to a man in the lawful bonds of wedlock ; the correlative of a husband." The third requisite, then, to consummate dower, has not taken place and never can take place in this case. Marriage, seisin and issue give to the husband a certain interest or estate, as tenant by the curtesy *initiate*, which he can convey before the death of the wife. ( *Co. Litt.* 30, *a.*)

But the wife has merely an *inchoate* right, during the husband's life, by marriage and seisin, which becomes consummate by, and only by his death, and then she has but a right of action not assignable. The death of one not her husband is not sufficient. If Wait had died the plaintiff's husband, if she had once been his widow, her right to claim dower would have been perfect, though she had married again.

There is nothing unjust or harsh in this construction. If divorced *a vinculo*, on her complaint, she is at liberty to marry again, to seek another protector, to become the doweress of the lands of another. The statute also gave her back her own lands. Perhaps this was necessary, as we have seen the husband may have had an interest in her lands, though if the divorce rescind the contract of marriage, it has a retroactive effect. (*And see* 1 *Hilliard on Real Prop.* 51 ; 4 *Kent,* 34 ; 10 *Paige,* 424.) In addition to this, the court, as we have seen, was required to " compel" the defendant to provide, not only for the maintenance of the children of the marriage, but a suitable allowance for the support of the complainant, and for life, and to give security therefor. Whereas the statute then in force in relation to decrees of separation did not require the defendant to give security, probably for the reason that as the relation continued he also continued bound to support her as much as when cohabiting. The power of the court under this act and the law of 1815, (page 225,) was probably sufficient to compel security, but the difference in the two cases is quite observable. Probably in this case, a sum in lieu of the support she might claim by the order of the court, was secured by a mortgage given on an amicable adjustment. But, if not otherwise arranged, the order for support was a matter of course. It may be remarked, too, that oftentimes this step on the part of the wife is not wholly compulsory, though always justifiable. Dower may be relinquished by the wife by release, or for jointure, or by accepting a provision in a will. Perhaps this provision may be considered somewhat analogous, though I prefer to put the matter where it belongs, upon strict legal principles. Nor would I in the least bend the law to screen the adulterer.

Wait *v.* Wait.

He who will break this sacred vow made in the presence of God and before the world, deserves only naked justice. But when it becomes a question of property between the former wife and his innocent heirs, that should be granted.

There is another argument, growing out of the nature of the divorce, that strengthens my conclusions. By this decree *the marriage between the parties is dissolved, and each party freed from the obligations thereof.* Marriage is a contract, and it may be important to look into the effect of this dissolution. The legislature, in all the acts, guard against the illegitimacy of the children. The fair implication from this is, that it was supposed it might, as in case of a divorce *a vinculo,* in the ecclesiastical courts in England, have a retroactive effect, and be in truth, a rescission of the contract, in the legal sense of that term. But this implication is met by the additional sections restoring to her her property when complainant, and cutting off her dower when defendant, both of which were certainly supererogatory if the divorce rendered the marriage void *ab initio.* Perhaps these provisions were added to prevent doubts and mistakes in matters so important, and no inference either way should be drawn from them. We are then to decide, upon general principles, what is meant by a dissolution of the marriage. Shelford says: "How far the title to dower or curtesy is affected by divorce, must depend on the nature of the divorce, for if it be a dissolution of the marriage, the rights consequent upon it will cease. But where the bond of matrimony is not dissolved, these rights may continue." (*Shelford on Mar. & Divorce,* 478.) And a divorce *a vinculo,* he remarks, bars dower, (*Id.* 420,) and that a legislative divorce is a complete dissolution. (*Id.* 476.) Macqueen speaks of it as a "rescission." (*Macqueen's H. of Lords,* 472, 480.) And again, in another work, speaking of Catholic divorces, he says: "For while the true object, in most cases, was to *rescind,* the avowed object in all was to *annul* the matrimonial contract." (*Macqueen on Hus. and Wife,* 197, 8; *and see Id.* 200, 201.) And speaking of the right of the offender to marry again after a divorce by an act, he says, "And as the marriage is annihilated by the act,

it is a logical consequence that she should have the same liberty
to marry again as her husband." (*Id.* 214.)   And Shelford
concurs in this opinion.   (*Shelf. on Mar. and Div.* 476.)
Paley says a divorce *a vinculo* " releases" the parties.   (*Paley's
Mor. Phil. b.* 3, *p.* 3, *ch.* 7.)   Bishop Cozens, whose argument
in 1669 in Lord Roos' case, carried through parliament the
first divorce granted by that body, says : " By adultery two are
made not to remain one flesh, hence it is that a contagious dis-
ease is not a dissolving of a marriage.   By adultery the very
essence of the contract is violated, but the contract ceasing, the
bond depending on the contract necessarily ceases."   *Mac-
queen's H. of Lords,* 559.)   To " annul" is to " make void,"
and to " dissolve" is to " annul."   ( *Web. Dic.*)   But rescission
and dissolution of a contract it is believed may be essentially
different.   Rescission is said to be the act of both parties, (*by
Mr. J. Coleridge in Franklin* v. *Miller,* 4 *A. & E.* 599,)
for one gives occasion (and is deemed to have abandoned) of
which the other avails himself.   But to rescind, the parties must
be placed in *statu quo.*   (2 *Hill,* 292.   5 *Hill,* 389.   1 *Denio,*
69.   *Chit. on Cont.* 276.   5 *East,* 449.   2 *Chitty's Rep.* 416.)
In this sense it bears a strong analogy to a divorce *a vinculo,*
granted by the ecclesiastical courts in England.   But a dissolution
of the contract is usually the act of the parties putting an end to
it from that time, and is not retrospective, and leaves nothing
executory.   It is in the nature of a mutual abandonment of the
contract.   Such is the sense of the term as used by the judges
in some of the cases.   (*See* 7 *East,* 471 ; 12 *Id.* 482, 550, *and
also a large number of settlement cases collected by Mr. Pe-
tersdorf, in his Abridgment, vol.* 14, *p.* 465.)   But it seems
dissolution is sometimes used synonymously with rescission ;
particularly where the contract is said to be dissolved *in toto.*
(2 *Kent,* 476.   *Stoddard* v. *Smith,* 5 *Binney,* 362.   *And see
Green* v. *Green,* 9 *Cowen,* 46.)   In either case the result is
obvious.   Marriage is a contract ; " in its origin a contract of
natural law," (*Sir William Scott in Dalrymple* v. *Dalrymple,
supra,*) but is nevertheless a contract.   This is dissolved, and
the parties respectively freed from the obligations thereof, and

Wait *v.* Wait.

neither can claim any thing, by virtue of the former contract, except what he or she has already acquired a perfect right to, or what is given by the act dissolving it.  The terms used in the act are most clear, conclusive and final.  The right to dower was inchoate, not consummate, when this dissolution took place.  She was not entitled to it at the time of the divorce, and if she could not claim it then she never can; the rights of the parties are then fixed and unchangeable.

Again; this conclusion is sustained by authority; and whatever may have been the reason originally given for the rule, after it has been so often repeated and never doubted, it would be impolicy now to adopt a different one, particularly as it affects real estate.  We have noticed the language of the early charters, and of our own statutes, defining and securing dower; and the forms of pleading in actions to enforce it, which are evidence of the law.  (*Ram on Judg.* 13.)  The text writers too, and I believe without exception, adopt the view here taken.  Coke, as we have seen, declares in explicit terms that the marriage must continue until the death of the husband.  The same rule is substantially repeated by Rolle, Viner, Comyn, Blackstone, Cruise, and Clancy, in England, and Kent, Dane, and Hilliard, in this country.  (1 *Rolle,* 680. 9 *Vin.* 211.  *Comyn's Dig. Dower,* (*A.* 2).  1 *Cruise,* 136, .140.  2 *Bl.* 130.  *Clancy on Hus. and Wife,* 197.  4 *Dane's Ab.* 663.  1 *Hilliard on Real Prop.* 130.  4 *Kent,* 54, 52, *n.*) The late Chancellor Kent very properly treats the provision for the support of the wife, to which she is entitled by our statute, as dower or indemnity for the loss of her dower; and says in relation to the clause of the act barring dower in case of a divorce for the misconduct of the wife, that "there was no need of the provision, for as the law always stood if the doweress was not the wife at the death of the husband, her claim of dower fell to the ground," and that "in case of a divorce, *a vinculo,* dower would cease of course."  (4 *Kent,* 52, *n.*)  Mr. Justice Bronson, in *Reynolds* v. *Reynolds,* (24 *Wend.* 196,) and Vice Chancellor, (now Mr. Justice) McCoun, in *Day* v. *West,* (2 *Edw. V. C. Rep.* 596,) take the same view.  The point was

Vol. IV.                    27

not necessarily passed upon, but those judges appear, from the reports of those cases, to have well considered it. The vice chancellor of the 4th circuit, now Mr. Justice Willard, in *Burr* v. *Burr*, (10 *Paige*, 25,) threw out a mere suggestion to the contrary, but immediately added that it was unnecessary to discuss or decide that question, as that was a case of divorce *a mensa et thoro*. After such a divorce, of course, she continues a wife, the marriage not being dissolved. His decision was sustained by the chancellor and the court for the correction of errors, but the subject of dower after a divorce *a vinculo* was not again adverted to in the progress of the cause. Were it not for the statutory prohibition, the offender, here as in England, might marry again, in which case there might be a novel scramble for dower on the death of an unlucky wight, who was better at making vows than in observing them.

Believing then that the statute, by making ample provision for the support of the wife, has fully answered the great end of dower; that it would be an anomaly in law for a contract after it is dissolved, and each party freed from the obligations thereof, to be still in part subsisting and executory; that the plaintiff does not answer the description of person to whom the law awards dower; and that it has been the received opinion for centuries that the marriage must continue until the death of the husband, to consummate title to dower; my opinion is against the plaintiff in this case.

Cady, P. J. concurred.

Willard, J. dissenting. The main question raised by this bill of exceptions is, whether the complainant is entitled to dower in lands whereof her husband was seised during the coverture, prior to the divorce for adultery committed by him, she being the innocent and he the guilty party. As the divorce took place in 1825, the cause must be decided, so far as the divorce is concerned, upon the law as it stood then.

When the case of *Burr* v. *Burr* was before me as vice chancellor of the 4th circuit, I intimated that " after a divorce for

adultery, the wife being the complainant, is still entitled to be endowed of the lands of which her husband had been theretofore seised." (10 *Paige*, 25, 26.) But the case of *Burr* v. *Burr* not being a bill for a divorce for *adultery*, but only for a separation, or limited divorce for *cruelty*, did not call for a decision of this question. The dictum, though in direct conflict with a dictum of Vice Chancellor McCoun, in 2 *Edw. Ch. Rep.* 596, was not repudiated nor sanctioned by the chancellor, on the appeal, nor by any member of the court of errors when the cause was before them, though the general principles of the opinion were fully sustained. (7 *Hill*, 207.) It therefore becomes necessary now to meet the question and decide it.

The act of 1787, concerning dower, directs that there shall be assigned to the widow, for her dower, the third part of the lands of her husband, which were his at any time during the coverture. (1 *R. L.* 56.) This is the same as is declared by *Littleton*, § 36, *of Dower*. (*Coke Lit.* 30, b. 2 *Bl. Com.* 129. 4 *Kent's Com.* 35. *Park on Dower*, 47.) Three things must concur to entitle the widow to an estate in dower, viz. marriage, seisin of the husband, and death of the husband. The marriage must be a lawful one, from which a legitimate issue may spring, capable of inheriting the land of which the husband was so seised. And according to the elementary books, (2 *Bl. Com.* 130 ; 4 *Kent's Com.* 54,) she must be the actual wife of the party at the time of his decease. If she be divorced *a vinculo matrimonii*, she shall not be endowed ; for *ubi nullum matrimonii, ibi nulla dos.* All the modern writers derive this doctrine from *Coke Lit.* 32, *a*, who limits the meaning of the term *divorce a vinculo matrimonii* to a divorce, rendering the marriage *void from the beginning, as for precontract, affinity, consanguinity*, &c., and not a *mensa et thoro* only, as for adultery. In speaking of a divorce *a vinculo matrimonii*, as depriving the widow of dower, the term must be understood as relating only to such divorce as makes the marriage void from the beginning, and which consequently bastardizes the issue. (*Shelford on Mar. and Div.* 706.)

The divorce in this case was granted under the 4th section

Wait v. Wait.

of the act of 1813. (2 *R. L.* 198.) That section authorized the court of chancery, on the defendant's being found guilty of the adultery charged in the bill, to decree "that the marriage between the parties shall be dissolved, and each party freed from the obligations thereof, *but such dissolution of the marriage shall not in any wise affect the legitimacy of the children thereof.* And it shall be lawful for the complainant, after such dissolution of the marriage, to marry again as though the defendant were actually dead. But it shall not be lawful for the defendant, who may be so convicted of adultery, to marry again until the complainant shall be actually dead." The dissolution of the marriage under a decree for a divorce for adultery, has no retroactive effect. It takes for granted that the original marriage was lawful. It operates only prospectively, and dissolves the marriage as to future transactions, only *sub modo.* It differs, therefore, in many respects, from the divorce *a vinculo matrimonii,* which Coke, and others after him, say puts an end to the claim of dower. That bastardizes the issue. (*Shelford on Mar. and Div.* 706.) The consequences of a divorce for adultery under the act of 1813, are similar to those arising from parliamentary divorces for the same cause. (*Id.* 576, 873, *et seq.*) In the latter the guilty party is not allowed to marry.

In Connecticut, a divorce for adultery is *a vinculo matrimonii ;* and all the consequences of divorce take place, except that the issue are not bastardized ; and the wife being the innocent party is entitled to dower. (*Reeve's Dom. Rel.* 208.)

The supreme court of Massachusetts, in *Davol* v. *Howland,* (14 *Mass.* 219,) held, that a wife divorced for the adultery of her husband, is entitled to dower in all the lands of which he was seised during the coverture, although he may have conveyed them before the decree of divorce. This latter case arose under the statute of Massachusetts of 1785, which gave to the wife divorced on account of the adultery of the husband, dower in any lands whereof he was seised during coverture, *in the same manner as if he were naturally dead.* The case, therefore, does not settle any common law principle, but the statute marks the sense of the people with respect to the rights of the

wife under an injury of this kind. It would be a strange anomaly in the law, if the wife should be deemed to forfeit her dower, for seeking the relief afforded her by law for the infidelity of her husband. It is contrary to the analogy of the law, to permit the crime of one party to work a forfeiture of the rights of another.

It is clear, that at common law, a divorce for the adultery of the husband did not bar the wife of dower. (*Coke Lit.* 32, *a.*) Nothing short of a divorce *a vinculo* worked that consequence; and by divorce *a vinculo*, was meant a divorce declaring the marriage *void* from the beginning, bastardizing the issue, and placing the parties in all respects as if no marriage had existed. The act of 1813 did not authorize a divorce *a vinculo* for adultery, in the common law sense of that term. It did not make use of that term at all. It merely dissolved the marriage and freed the parties from the *obligations* thereof, but without impairing the *rights* which accrued under it, except so far as is specified in the 6th, 7th, and 8th sections. By the 6th section the separate estate of the wife, on a divorce granted for the adultery of the husband, is preserved to her; and by the 7th section it is vested in the husband, on a divorce for the adultery of the wife, in the same manner as if the marriage had continued. And by the 8th section it is declared that the wife being the defendant, and convicted of adultery, shall not be entitled to dower in the complainant's real estate, nor to a distributive share in his personal estate, on his dying intestate. It would seem, therefore, that she being the innocent party, and the divorce being granted for his adultery, she would be entitled to dower. The 5th section, which provides for permanent alimony to the wife, and for the support of the children of the marriage, is not declared to be in lieu of dower, and has never been so treated in this state. (*See Burr* v. *Burr,* 10 *Paige,* 20; 7 *Hill,* 207; *Cramer* v. *Lane, and Burr* v. *Lane, MS. decided by me as V. Chan. in April,* 1846, *growing out of the divorce in Burr's case.*) The widow of Burr was there adjudged entitled to her permanent alimony for life, as a debt

against her husband's estate, and a distributive share of his personal estate, and dower in his real estate besides. In some of the states it is understood that the allowance by way of alimony, is declared to be in lieu of dower. (*R. S. Verm.* 326.) In others the dower is reserved to the wife, and may be recovered immediately after the decree, *as if the husband were naturally dead.* (*Mass. act of* 1785.) I am satisfied that the maxim *nullum matrimonium, ibi nulla dos,* applies only to cases where the marriage never in fact existed, or has been declared *void* from the beginning. Under a divorce, therefore, granted for the adultery of the husband, in pursuance of the act of 1813, the marriage may be deemed so far continued, notwithstanding the separation, as to preserve the right of the wife to dower in the lands of which the husband was seised at any time during the coverture and prior to the divorce.

The second matter to be considered is the seisin of the husband. This must be of such an estate "so as by possibility it may happen that the wife may have issue by her husband, and that the same issue may by possibility inherit the same tenements of such an estate as the husband hath, as heir to the husband of such tenements. Of such seisin she shall have dower, otherwise not." (*Litt.* §§ 53, 36. 2 *Bl. Com.* 131. *Park on Dower,* 79.) 4 *Kent's Com.* 38, 39.) It must therefore be a seisin during the coverture and prior to the divorce, because of no other could the issue of the marriage by possibility inherit. If, therefore, the divorce annulled the marriage from the beginning and bastardized the issue, dower never could attach; because not only the maxim *nullum matrimonium ibi nulla dos,* would apply; but also the principle, that when the issue could not by possibility inherit to the husband, dower cannot be granted.

In the present case, the seisin of the husband during the coverture was shown, of an estate whereof the issue of the marriage could by possibility inherit to the husband. And in the third place, the death of the husband in 1845 was shown, thus establishing all the requisites to a perfect estate in dower.

---

Wait *v.* Wait.

---

The case has hitherto been treated as if it arose wholly under the act of 1813. The legal effect of the divorce is no doubt to be construed with reference to the law in force at the time it was granted ; but as the title to dower did not become consummate until the death of the husband, (*Reynolds* v. *Reynolds,* 24 *Wend.* 197,) it becomes necessary to see whether the law remained unchanged at that time.

The act in relation to dower (1 *R. L.* 740,) is merely a revision of the former law, and contains no alterations affecting the present question. The revised statutes in relation to divorces (2 *R. S.* 141 *to* 148) essentially changed the former law, and greatly enlarged the jurisdiction of the court of chancery with respect to this matter. Article two of this title (2 *R. S.* 141) vests the chancellor with power in certain specified cases, by a sentence of nullity, to declare void the marriage contract. Such divorce, beyond question, puts an end to the claim of dower, and bastardizes the issue. Article three (2 *R. S.* 144,) provides for divorces, dissolving the marriage contract for the adultery of one of the parties. Such decree does not bastardize the issue born or begotten prior to filing the bill, when it is exhibited by her ; nor when born or begotten before the commission of the offence when exhibited by the husband ; and it leaves the right of the wife to her own property when she is the innocent party, and the right of the husband to the property of the wife when she is the guilty party, in the same manner as though the marriage had continued, as was provided by the law of 1813. And in like manner it is provided by the 48th section, (2 *R. S.* 146,) that a wife being defendant, in a suit brought by her husband, and convicted of adultery, shall not be entitled to dower in her husband's real estate, or any part thereof, nor to any distributive share in his personal estate. The 49th section allows the complainant, when the marriage is dissolved, to marry again during the lifetime of the defendant, but prohibits the defendant convicted of adultery from marrying again, until the death of the complainant. The 4th article provides for separation of husband and wife from bed and board, or limited divorces, for certain acts of cruelty or abandonment on the part of the hus-

band. And subsequent sections provide for permanent and *ad interim* alimony, applicable to every case. Thus it will be seen, that there is no change in the law, affecting the present question. We have now three species of divorce, namely: 1. A divorce declaring the marriage null and void from the beginning, which answers exactly to the divorce *a vinculo matrimonii*, spoken of by Coke as putting an end to the claim of dower; 2. A dissolution of the marriage contract for adultery, partaking, in some respects, of the nature of a divorce *a vinculo*, but having a stronger relation to a divorce *a mensa et thoro;* and 3. A separation, or limited divorce, being in short a mere divorce *a mensa et thoro.* When the marriage has been declared null under the first class of cases, it is conceded that the estate of dower and curtesy cannot exist. But it is believed that neither of the other divorces is incompatible with the existence of that estate.

The remaining questions grow out of an alleged compromise between the plaintiff and her husband Joseph Wait, about the time of the divorce. It seems that a parol submission was made by the plaintiff and her husband of matters in difference between them, and a parol award was made by them; after and in pursuance of which a writing was executed by the plaintiff and her husband, and delivered to Mr. Given, the counsel of one of the parties, and who was then the law partner of Mr. Cramer, and a bond and mortgage were executed by the said Joseph to the plaintiff in the penal sum of $700, conditioned to pay the plaintiff $30 a year for life, and in case of default of payment the whole to become due immediately. It was shown that Mr. Given had been dead some years. I think the judge was right in holding that the loss of the paper was not shown. Mr. Cramer should have been introduced as a witness to prove a search among the papers of him and Mr. Given. There was no room to raise a presumption of a release of dower, from the acts of the parties; because it was proved that their agreement was reduced to writing. That writing, if produced, would speak for itself.

---
Whispell *v.* Whispell.
---

The annuity of $30 a year was probably the alimony allowed to the wife by the agreement.

I think the cause was rightly disposed of at the circuit, and that the motion for a new trial should be denied.

*ᐸ꒰ᑋ*                                                **New trial granted.**

---

ALBANY GENERAL TERM, September, 1848.  *Harris, Watson, and Parker*, Justices.

## WHISPELL *vs.* WHISPELL.

On a bill filed for a limited divorce, the acts of violence and cruel treatment specifically alleged present the matters in issue to which the proof is to be directed; but under the general allegation in the bill of complaint the court will look at the general conduct of the defendant towards the plaintiff, for the purpose of understanding more fully the circumstances complained of, and the true relations existing between the parties.

To authorize the interposition of a court of equity for the purpose of declaring a limited divorce, there must in all cases be ill treatment and personal injury, or a reasonable apprehension of personal injury.

Where such personal injury has been proved, the court will consider also the language and conduct of the defendant designed to wound the feelings of the wife or to destroy her happiness. And grossly indecent language spoken to, or of, the wife, by the husband, will find neither palliation nor excuse in the fact that the parties have not enjoyed the advantages of cultivated society.

If condonation may be inferred from cohabitation, the presumption may be rebutted by the accompanying circumstances.

Condonation is always subject to the condition that the husband shall afterwards treat his wife with conjugal kindness.

IN EQUITY.  This was a bill filed in the late court of chancery, by the wife against her husband, for a separation *a mensa et thoro* on the ground of cruel treatment.  The defendant answered, denying the allegations in the bill, and a replication was filed, and proofs were taken.  The parties resided at Shan-

CASES IN LAW AND EQUITY

daken, Ulster county. The cause was first heard before justice Watson, and was brought before the general term for a re-hearing.