DAVID B. DAVIS, Plaintiff in Error, v. LOUISA DAVIS, Defendant in Error.

ERROR TO FULTON.

If the injured party cohabits with the other, subsequent to an adulterous offense, having the ability to prove the fact, it will be a bar to a proceeding for divorce; the offense will be thereby considered as condoned.   But condonation is always accompanied with the implied condition that the injury shall not be repeated, and that the offending party will thereafter treat the other with conjugal kindness, or the offense will be revived.

A suit for a divorce on the ground of adultery, will be barred by proof of a like offense by the complaining party, though committed even during the pendency of the suit.   But the fact must be clearly proved.

Cruelty of an aggravated character may revive the offense of adultery impliedly condoned; and when properly brought to the knowledge of the court, during the pendency of a suit claiming a divorce for adultery, will authorize a decree of divorce.

THE defendant in error filed her bill in chancery in the Fulton Circuit Court, on the 22nd of August, 1854, praying for a divorce and alimony from the plaintiff in error, and the custody of the children of the parties.

The bill shows that the parties were married in the year 1840, in the State of Michigan; that they resided for several years in Chicago, and cohabited until April, 1853, when the defendant in error left her husband on account of and *when* she discovered that her husband had been guilty of adultery, since which time she lived separate from him, in Fulton county.

The bill shows, as cause for divorce, that the plaintiff in error had been guilty of adultery with Ellen Matilda Evans during the cohabitation of the parties, during the years 1848 to 1852, inclusive, and the result thereof was the birth of a bastard child; and that since her separation from her husband, and at the time of the filing of the bill, the plaintiff in error lived in a state of adultery with the said Ellen Matilda Evans.

Three children were the issue of the marriage—boys, of the ages of thirteen, eleven and six, at the time of filing of the bill.

On the 6th of September, 1854, the plaintiff in error filed

his answer, in which he neither admits or denies the charge of adultery while the parties cohabited together, and denies that he had been guilty of adultery since the defendant in error left him. The answer admits that the defendant in error left the home of the parties, in Chicago, in April or May, 1853, and came to Fulton county, but denies that the reason was because of the discovery of the adultery of her husband, and avers that she came, by his consent, to visit a brother and sister of the plaintiff in error, the sister being afflicted with the consumption, of which she soon after died, in August, 1854; that the plaintiff in error then came to Fulton county for his wife, who voluntarily returned with him to Chicago, where she remained and cohabited with him for four or five weeks, when, in compliance with the dying request of the sister, the defendant in error, with the consent of her husband, returned to Fulton county, to remain a short time, to aid his brother in arranging his affairs. The answer denies that the parties had not cohabited together after April or May, 1853, but avers that they continued to cohabit, when together, until June, 1854.

The answer then sets up *condonation,* and relies upon that to avoid the charge of adultery made against the plaintiff in error.

The answer also presents fifteen letters of the defendant in error, addressed to her husband after she left Chicago, in the spring of 1853, and which were afterwards read in evidence.

This answer was *sworn to* by the plaintiff in error.

On the 24th of May, 1855, by leave of the court, the plaintiff in error filed a further answer, in which he charges that the defendant in error committed adultery with Stephen W. P. Davis, at a public house between Peoria and La Salle, on the 10th of August, 1854, and again in the county of Peoria, on the 27th of August, 1854, and at Chicago, in Cook county, on the 5th day of August, 1854.

No replication to either answer was filed.

At the February term, 1856, the cause was tried before THOMPSON, Judge, and a jury.

The issues presented were three, to wit:

1. The charge of adultery against the plaintiff in error, in the bill, with Ellen Matilda Evans.

2. The condonation thereof by the defendant in error, after full knowledge of the same.

3. The charge of adultery against the defendant in error, with Stephen W. P. Davis.

The jury returned a verdict, finding the the defendant guilty; that the offense had not been condoned, and that the complainant was not guilty.

The defendant moved for a new trial, which was overruled, and the defendant excepted.

The court entered a decree dissolving the marriage, and made the injunction on the defendant perpetual; gave the exclusive custody of all the children to the complainant until their majority, and enjoined defendant from exercising any control or rights over them, and ordered defendant to pay all costs, and allowed execution therefor, and provisional alimony.

To the decree, and every part thereof, the defendant excepted.

GOUDY & JUDD, for Plaintiff in Error.

J. GRIMSHAW, for Defendant in Error.

BREESE, J. The cause of divorce, as alleged in the complainant's bill, is the adultery of the husband. In his answer, he does not deny the charge, but insists that complainant, being fully aware of his transgression, continued to cohabit with him, whereby the offense was condoned—forgiven.

It is a well settled principle, if the injured party, subsequent to the adultery, cohabits with the other, after a knowledge of the fact, and with the ability to prove it, it is in judgment of law, a remission of the offense and a bar to a divorce. Condonation has always been held a good bar.

It is not, however, so readily presumed as a bar against the wife as against the husband. Forgiveness, with the hope of reclaiming a husband, is meritorious, and time is given her in which to cherish this hope for that object, but time must be reasonable.

The proofs in this cause show, that for a series of years, respondent had a concubine, and her child, of which he was the father, in his house, making part of his family circle. That the complainant knew this, and though they frequently quarreled about it, she was submissive, and seemed to betray no concern that caresses which were her due, were lavished upon a wanton.

As early as 1851, she was informed by his niece, that he had confessed to her that he was the father of the child, and that he thought as much of it as he did of his other children. To others he made the same statement, so that complainant had it in her power, at that time, to make proof of the fact, had she then instituted a suit for a divorce.

She, however, continued to live in this way with her three children, until the spring of 1853, when she, with the consent of her husband, and with her youngest child, visited his relatives, in Fulton county, ostensibly for the purpose of attending upon the sick bed of his sister, who died in August, of that

year. Here she remained until the first of September following, when her husband came and took her and the child home. On the first of October, of the same year, they again, with their three children, visited his brother's, in Fulton county. He remained three or four days and returned home—she, with the children, continuing at his brother's.

Whilst on these visits, during the summer of 1853, and up to June, 1854, she addressed her husband frequently, by letter, conveying, in some of them, her kind regards to his concubine and her child, and to other women who were domiciled with him, in her absence.

These letters, set out in the record, manifest anything but refined sentiment, or that delicacy of feeling which is one of woman's brightest characteristics. They contain no complaint of his conduct, but manifest a subservience to him in all matters, and a desire to be governed by his wishes in all her movements. Respondent visited her occasionally—in January, 1854, remaining two weeks—again in March, staying one day—again in May, remaining eight or ten days—and again in June, 1854, they occupying, on one or two of these occasions, the same bed. There was not, it appears, any open rupture between them, until June, 1854, when she refused to return home with him, and after his departure, she addressed him a letter, date June, 20, 1854, as follows: "As for me, I am in the same mind as when you left here; you think hard of me, but I cannot help it; as for me to make up my mind to keep house, I cannot, so if I am to blame, so it is. I have seen trouble enough on that score, so I will try another way, and see which road is the easiest to travel. You spoke of me about me a killing you; how do you think I have stood it for this fifteen years. I think it is time to stop. We have seen a great deal of trouble together, so I think you ought to be happy to have it at an end. You will be at liberty, and the children will not hear so much quarreling. Leave the children here till fall, or till the sickly season is over, and then make such arrangements as suits yourself; if my mind should change, I will let you know by letter. You write as soon as you get this. I expect you will be angry, but I cannot help it. So good bye for this time."

Soon after this communication, which was the last between them, respondent applied for and obtained a writ of *habeas corpus* directed to his brother, S. W. P. Davis, at whose house she resided, to produce her and the children before a judge at Chicago, the place of his residence. Respondent, with an officer, attempted to serve this writ, but did not succeed; and in the meantime, complainant filed her bill for a divorce, and obtained an injunction restraining him from interfering with her

or the children. Why this particular time was chosen to separate from her husband, is left to conjecture. She had then all her children with 'her, and she may have been aroused to prompt and decided action by statements of her eldest son, who remained with his father, during her protracted absence the previous summer.

It appears by the testimony of her oldest son, David Finney Davis, that whilst she was absent, in the summer of 1853, respondent had in his house other women besides his concubine, some of whom were not named by complainant in her familiar letters, already alluded to, and it may well be supposed she understood they were there for no good purpose. Her letter shows that for fifteen years her domestic circle had been full of misery to her, and that she could not endure the thought of encountering it again, and that she had communicated to him, when he visited her in June, her fixed resolve to live with him no more. She had become satisfied there was no hope of amendment in him; and she preferred to travel, under her own guidance, another road — desolate, it might be, and dreary, but preferable to the tortures she had, by his conduct, for so many years uncomplainingly suffered, and now increased, and which she seems just then to have began to feel most keenly. Although her social position was not an enviable one, nor her feelings refined or sensitive, as her letters show, yet, even with such, the occasion may arise, when woman's noblest nature will be aroused, be true to its own high instincts, and vindicate itself.

It appears, from the proofs, that at the time of her October visit to Fulton county, she communicated to her husband's niece her determination to leave him, assigning, as the cause, his refusal to put away his concubine — that she believed he continued his intercourse with her — and that she had so told him; and, to deter her, he had declared, if she did leave him, she should not have the children. He stated to a friend that in this journey to Fulton county she had declared to him she would not live with him, assigning the same cause, but he thought she was joking. Yet she did — notwithstanding all this — occasionally cohabit with him, up to June, 1854; so that the condonation set up in the answer would seem to be complete.

It is true, great allowances must be made for a mother under the circumstances in which she is often placed. She has not the same power of immediate and resolute action as a father has. He has, by law, the custody and control of the children and of the estate, and is by nature better qualified to take prompt measures to vindicate his honor. On discovering his wife's infidelity, he can remove himself and his children beyond her reach and from all intercourse with her, and, on the instant,

institute legal proceedings; nor do his friends desert him in such an emergency.

Not so with the mother who has discovered her husband's faithlessness; for, though faithless, he may still be loved, and it is her nature to cling to him, and to her children, until the very last—until the iron has entered deep into her soul—until all hope has fled, and no relief is before her but separation or the grave. She is often without means, without friends or advisers, and knows not when or how to act, and often wants the firmness to face the calamities that menace her. Liberal allowances should be, therefore, and are conceded to her; but years of quiet resignation and acquiescence, such as this complainant has manifested, forbid us from believing otherwise than that the condonation was perfect and complete.

But condonation is always accompanied not only with the implied condition that the injury shall not be repeated, but also that the offending party will ever thereafter treat the other with conjugal kindness.

Now, though there is no evidence that he did not treat her with kindness before and up to the time of the commencement of this suit, saving the condoned offense, and leaving out of view the attempt to arrest her under the *habeas corpus* writ, in which no actual violence was used, yet facts have been developed, during its progress, by which he ought to be tried and judged, and of which complainant should have the benefit.

In the amended answer of respondent, filed in May, 1855, he recriminates; he charges complainant with adultery with his own brother. Not content with the forgiveness his wife had extended to him, he, fiend like, to ruin her character forever, to degrade the mother of his children—her whom he had vowed to cherish and support—makes this scandalous charge against her.

This principle of recrimination is incorporated into our law from the civil and canon law, and is fully acknowledged by all the courts of this country, whatever want of harmony there may be in defining its limitations and the extent of its application to our jurisprudence. Our courts all agree that a suit for a divorce on the ground of adultery is barred by proof of adultery of the complainant, though it may have been committed during the pendency of the suit.

The party, however, setting up adultery in recrimination, is required to prove such adultery by sufficient evidence. 5 E. Ecc. R., 130, 136. Proof of suspicious circumstances is not sufficient.

The most prominent witness to prove this charge was the respondent's concubine, who had the unblushing effrontery to appear in a court of justice, to blast, by her testimony, the

Davis *v.* Davis.

character of one she had grievously wronged. She deposed to some suspicious circumstances, it is true; but we think they were satisfactorily explained by other testimony. The jury thought so, and ignored the charge. It seems to have been a groundless and malicious charge, but he pursued it, and pressed it, with a most persistent determination, and with all the energy malice could inspire, as the facts abundantly show.

About the time his answer was amended, setting up recrimination, the respondent procured the services of the deputy sheriff of Cook county, one Norton, and another officer, to go with him, with a writ, to her then residence in Fulton county, to arrest her. The deputy sheriff, in his testimony, does not say what was his object in going there, but he says he was there, as an officer, in May, 1855, and saw the complainant and her children, who behaved in a violent manner—the oldest boy getting a pistol, and placing it in the hands of his mother—that the children were very abusive to their father, etc. He says nothing about making an arrest.

The circumstances of this affair, and the conduct of the parties, is more fully detailed by other witnesses.

David Finney Davis, the oldest son, then fifteen years of age, states that he was present when a Chicago man came with a writ. He broke in the door, and caught complainant by the throat; got her out in a carriage; said he had a writ. Respondent helped complainant in, then Mr. Kelsa came. Neither witness nor his brother threatened to shoot, but complainant requested him to get the pistol, and he did so, and put it in her hands. The neighbors interfered, and respondent went away without complainant.

James P. Davis, another son, then thirteen years of age, says, " he was at his uncle Stephen's when Norton came there; did not say he had a warrant, nor nothing, but caught mother by the neck and took her out, and then said they had a warrant; mother screamed."

Making all proper abatement for the partiality these boys undoubtedly have for their mother, we are compelled to give their statements reasonable credit, and they are corroborated, in some degree, by the testimony of a disinterested spectator, William P. Blair, who says, he was called when Norton was at the house of Stephen Davis; found respondent and Norton, complainant and her children, and a hired girl there; after, the Kelsas, and others, came. We were unwilling complainant should be taken away, and it was prevented by those present. Norton said he had a warrant.

Now, none of these witnesses, Norton included, state what the warrant was for—what crime was charged—and we can

only infer, from the fact set up in the amended answer, that respondent had matured this plan of an arrest, in order to give weight, or an appearance of plausibility, at least, to his recriminatory charge. He hires an officer of the law of a foreign county for the purpose, and violates the law to make the arrest. Breaks open the door, seizes the complainant by the throat, forces her into a carriage, and is only deterred from the execution of his purpose, by the interference of the bystanders.

That the writ or warrant for her arrest, was for this alleged offense of adultery, we cannot doubt, for he actually arrested her on this charge, at a time subsequent, and had her taken to Chicago, thence to New York, and returned,—actually kidnapping her—when, on giving bail for her appearance to answer the charge, she was released.

This affair is explained by the testimony of Stephen Davis, who states, " that much contention between him and respondent, grew out of the interest he had taken in the matter, resulting in civil and criminal prosecutions, and that he was arrested, and taken to Chicago, on a charge of living in an open state of adultery with the complainant." Complainant was also arrested at the same time, and conveyed to Chicago. They took witness to the police office, and while there, they took complainant, in a carriage, 'to the railroad depot, and thence to New York, near Buffalo. She was brought back, in a short time, by a police officer, on the bail bond, into which she had entered to appear for examination on said charge. Witness was discharged on examination. After complainant was brought back from New York, she returned to witness's house.

Connecting this with the defeated attempt, made in May, to arrest her, by respondent and the Chicago officer, we are forced to infer that this arrest, and the proceedings under it, were at the instigation of the respondent; for who, but he, had exhibited any feeling or interest in the matter? and who, but he, was to profit by it, and by her conviction? Who, but he, was wicked enough to attempt it? Could he make out a *prima facie* case against her, and thus sustain his amended answer, the complainant would fail in her suit, and respondent be reinstated in all his marital rights, and in a position to exercise his tyranny over her; so that he had a deep interest in the proceedings.

These things, the record shows, occurred *pendente lite*, and it becomes a question, how far can they be used to weaken the effect of the condonation of the original offense of adultery of the respondent, as implied from the cohabitation proved, and so revive that offense?

We have found no reported case like it, but on principle, we are inclined to think, they should revive the condoned offense.

The amended answer, setting up adultery of complainant, may be regarded as a cross bill, and the very fact of failing to prove the charge in it, and his brutal and cruel treatment of her, consequent upon it — seizing her by the throat, forcing her into a carriage, and subsequently, actually arresting her and abducting her from the State, and holding her to bail on the malicious and groundless charge, is cruelty of an aggravated character, and such cruelty, considering the condition of condonation, as should revive the original offense.

As our law attaches the same consequences to cruelty as to adultery, we are not authorized to distinguish between these offenses, but to give them the same effect; and as a repetition of the respondent's adultery would revive that which was condoned, so, necessarily, will cruelty, though brought before the court, as this was, after suit brought. To the charge thus presented by an amended answer, if viewed as a cross-bill, the complainant has the right to defend by answer, setting up the cruelty, or, as in this case, by such proof of it as may be at her command.

It would have been entirely competent for the complainant to have brought these facts to the notice of the court, by a supplemental bill. In matrimonial suits, the bill originally filed can contain only those facts that can, by diligence, be ascertained at the time of filing it.

In the English ecclesiastical courts, it is every day's practice to introduce charges of adultery committed since the institution of the suit, by supplemental bill, and a sentence may be obtained on facts not existing at the commencement of the suit. 3 Eng. Ecc. R. 152; 4 ib. 301.

And without a supplemental bill, in these courts, a complainant in a libel for divorce founded on adultery, may show acts of adultery committed by the respondent, during the progress of the trial. 5 ib. 1.

If so, then complainant ought to avail of respondent's cruelty to revive the offense of adultery impliedly condoned, and less cruelty is necessary to revive than to found an original suit. 5 ib. 233.

Where, then, the necessity of driving her to a supplemental bill, or a fresh suit, when all the matter can be determined as the pleadings stand? Why should not the wife have the benefit of the husband's subsequent transgressions, when he, by his answer, opens wide the door to admit them? These facts would certainly avail the complainant, if substantially used and alleged by her, and they ought, therefore, to revive the first fact, which is the ground of her complaint. 3 E. Ecc. R. 330.

Pleading condonation by the husband, is, in effect, a prayer

that the wife may be compelled to return to cohabit again with him; and to this decree he would be entitled, if he has not forfeited this right.

Suppose the subsequent misconduct was adultery, can it be said that the forgiveness would not thereby be as effectually forfeited as if it had been committed prior to the commencement of the suit? Is not the wife as much interested in the purity of her husband's conduct, after, as before the filing the bill, so long as she continues his wife? If this be so, then, to dismiss the bill, notwithstanding his subsequent incontinence, because of her forgiveness of the first, would be to remand her to a doubly polluted bed, and to say to her, that, by filing her bill, she gave him full liberty to renew his debaucheries, until the suit shall be decided.

As we have shown, cruelty has the same consequences as adultery; and that being established against him, the forfeiture is established, and she should, therefore, be absolved from all her obligations to him.

The disposition to be made of the children is not without embarrassment. The father has, by law, the superior right to their custody and services, which can be forfeited by his misconduct; yet, it would seem, taking all the circumstances of this case into consideration, a total forfeiture would be going further than they will warrant. We think it would be more equitable, as both parties are in the wrong, though in quite unequal degrees, that the benefits and responsibilities attending their nurture and services, should be divided. The eldest boy, David Finney, is of an age now to render his mother efficient service; and her youngest born, William, must, naturally, be quite near to her affections; they, therefore, are committed to her custody. The other, James, is committed to the respondent.

Some objections have been taken to the instructions which were given for the complainant to the jury who tried the issues made. Taking them all together, we see nothing objectionable in them.

As to the disposition of the children, and alimony, it must be understood, they are questions, in this, as in all like cases, subject always to reëxamination and reconsideration by the Circuit Court.

With these views, the decree of the Circuit Court is affirmed, as modified, with costs.

*Decree affirmed.*