Dwight, Ref.
—[After reviewing the testimony which the referee held sustained the charge of adultery by Mrs, Uhlman, and the evidence claimed to establish a forgiveness or condonation thereof.]—Con-donation is a purely technical term of the English ecclesiastical law. There are certain fixed rules connected with it, which, in the main, are incorporated into the American law of divorce. The New York statute (Code Civ. Pro. § 1758), uses the word “forgiveness.” This is a word of a more popular kind than condonation—Anglo-Saxon instead of Latin—but with the same general meaning.
The statute provides that a party is not entitled to a divorce, although the adultery is established, “ where the offense charged has been forgiven by the plaintiff. The forgiveness may be proved either affirmatively or by the voluntary cohabitation of the parties with the knowledge of the fact.” Another form of statement is that it is either express or implied.
It is to be observed that the Code does not use the word “facts,” but “fact.” The expression used is, “ the knowledge of the factR What fact? There is only one fact that can possibly be referred to, and that is the fact of adultery. In construction, that word *240 may be substituted, aud then the section would read, “with the knowledge of the adultery.” In this respect, the Code differs from the Revised Statutes, where the word “facts” is used (2 R. S. 145, § 42).
Should it be considered that the word “fact” in the Code is a mere clerical error, and that the word “facts” was intend„ed, yet the decisions show that it is requisite that the forgiving party should know all . the facts going to make up the offense. The law is clearly stated by Dr. Lushington in Turton v. Turton (3 Hagg. Ecc. 333, 351). He says, “ In order to found a legal condonation, there must be a complete knowledge of all the adulterous connection and a condonation subsequent to it.” To the same effect is Campbell v. Campbell (Deane Ecc. 285, 288). This is not only law but good sense, for otherwise the forgiving party acts under a mistaTce. There is no true consent on his part; the mind does ngt in' any proper sense act in the case.
The necessity of fullness of knowledge is dwelt upon from the earliest cases down to the present day (See Durant v. Durant, 1 Hagg. Ecc. 733; Bramwell v. Bramwell, 3 Id. 618, 629; Pollack v. Pollack, 2 Sw. & Tr. 648; Ellis v. Ellis, 4 Id. 154; Campbell v. Campbell, Deane Ecc. 285, 288, and many other cases).
The American authorities are distinct to the same effect. I refer to Williamson v. Williamson, 1 Johns. Ch. 488, 492; Davis v. Davis, 19 Ill. 334; Phillips v. Phillips, 1 Bradw. 245 ; Burns v. Burns, 60 Ind. 259.
In Phillips v. Phillips, supra, it is stated that clear proof of Knowledge of the adulterous act is essential to establish a condonation. In Burns v. Burns, 60 Ind. 259, it is held that condonation will be inferred from the cohabitation after the injured party Knows of the commission of the offense.
Some early authorities seem to regard “probable knowledge” of the facts as sufficient. This is a very vague and misty expression, conveying no distinct *241 idea to the mind see (Delliber v. Delliber, 9 Conn. 233). The modern cases employ the more distinct and appropriate expression, knowledge of the facts, and that I assume to be the true statement of the rule applicable to the case.
There is still a possible uncertainty in the meaning; of the expression 66full knowledge.” An aggrieved party may have the most complete knowledge of the facts from the lips of witnesses, or may be convinced, by a strong chain of circumstantial evidence, and yet may not be able to make use of Ms knowledge in a court of justice so as to establish the fact of adultery. Boes the term “knowledge” imply provable knowledge % If not, the aggrieved party is in a dilemma. He or she must decline cohabitation at a great risk. If a husband should leave a wife under such circumstances she might be liable to a charge of desertion ; if a husband should turn the wife away as an adulteress he would be liable for her support as well as to an action for desertion, and to just censure in the community for acting on insufficient grounds. There are some sensible observations upon this subject in 2 Bishop on Mar. & Dir. § 43. The legal decisions are to the same'effect (Hoffmire v. Hoffmire, 7 Paige, 60; Quincy v. Quincy, 10 N. H. 272, 274).
I think that it is not only necessary that the husband should have full knowledge of the facts, but that lie must be able to prove them. Accordingly, a private otal confession by the wife to the husband would not suffice, as there would be no mode of proving the confession as the law now stands.
Under these rules, circumstances of a suspicions nature simply would not be sufficient to constitute knowledge. This proposition is maintainable both on the ground that a husband is likely to construe suspicious circumstances in a favorable light and to listen to the asseverations of his wife, and because it would *242 be an act of rank injustice to discard her on insufficient grounds (Kirkwall v. Kirkwall, 2 Hagg. Consist. 277; Brown v. Brown, L. R. 7 Eq. 185, 193; 2 Bishop Mar. & Div. § 40; Quincy v. Quincy, 10 N. H. 272; Burgess v. Burgess, 2 Hagg. Consist. 233, 237). “Aman cannot act on mere suspicion as he would on full proof.”
It is a further rule on the subject of condonation that the husband should believe the wife to be guilty. This point is worked, out with great fullness in the case of Ellis v. Ellis, 4 Sw. & Tr. 154. The court said: “In order to establish condonation it is not enough to prove that the husband took his wife back after certain facts had come to his knowledge, after certain intelligence had been communicated to him tending to prove her adultery ; it is necessary to prove that the husband took his wife back with the intention of forgiving her, believing her to be guilty. If the evidence leads the court to the conclusion that the husband did not thoroughly believe that his wife had been guilty, and therefore did not forgive her when he took her back, condonation is not established.” The same result is dedncible from the language of the New York statute. It provides for the offense being forgiven— no-t the acts, but the offense. How can the “ offense? be. forgiven, unless it is supposed that there is an offense to forgive.
There is one further suggestion to be made. A knowledge of the facts implies not merely an acquaintance with the facts concurring to prove a particular charge of adultery, but of all then existing charges of adultery. <* In other words, in order to have a condonation of the Stokes’ intrigue, it is not enough that Mr. Uhlman should have known the facts in that case, but also in the prior case of Adler. Consider fora moment what condonation is in its nature. It is, as a recent English judge has pronounced it, a “ blotting out” of the *243 offense—a complete reinstatement of the wife in her original position as head of the family and mistress of the husband’s affections. Suppose she had committed a score of adulteries. One of them might have been committed under the greatest temptations, belonging to the class which Dr. Lushington in one. case described as u comparatively venial.” The husband, knowing that and that only—knowing the sin, it is true, but yet the palliating circumstances, resolves to forgive and to ublot out ” her offense. In such a case, could it reasonably be said that he would have forgiven her so had he known her corrupt character and the frequent repetitions of her offense % A man might forgive a wife sinning once, and yet would abhor to dwell with a Messalina or a Theodora. This view is in accordance with Durant v. Durant, 1 Hagg. Ecc. 733. In this case Durant had three illegitimate children by a woman named Bradbury. He relied in his defense to a charge of adultery upon condonation by Mrs. Durant. It appeared in evidence that Mrs. Durant knew of two of these acts of adultery at' the time of the alleged condonation, but not of the third. The court held that there was no legal condonation (1 Hagg. Ecc. 751, 752).
[Applying these principles to the case at bar, the referee held that there was no sufficient evidence of forgiveness on Mr. Uhlmann3s part, and continued;] Can a husband by implication condone an adultery conditionally f Can there be an implication of law that he said this in substance, <6I know nothing of the facts ; you deny your guilt absolutely, but if you are guilty I forgive yon.” Will the law imply that ? I think not. Such an bnplí '.¡on would be plainly inconsistent with the Code or Civil Procedure, which enacts knowledge of the facts as preliminary to u forgiveness.’ 5 In Bramwell v. Bramwell (3 Hagg. Ecc. 618, 634), it was held that a reconciliation pleaded in that *244 case was no condonation because it took place on an averment by the guilty party of his innocence.
[The referee, after deciding that Mr. Uhlmann was entitled in the superior court case to a judgment against Mrs. Uhlmann for divorce, on the ground of adultery, proceeded to consider the charges of cruelty against Mr. Uhlmann, made in the complaint in the superior court action.]
An important preliminary remark is,, that if the former part of this opinion is correct, there is but little use in investigating this subject. Mr. Uhlmann being entitled to a divorce on the ground of the adultery of Mrs. Uhlmann, cruelty on his part will not be a bar to liis proceeding for a divorce. The law provides a remedy for such a wrong in granting a judicial separation to the injured party. Cruelty does not confer a license upon the. injured party to commit adultery (Forster v. Forster, 1 Hagg. Consist. 144, 146). Lord Stowell there says: “The wife is not to find her remedy in the contamination of her own mind and person, but in 1 the purity of her own conduct, and in a dignified submission to an undeserved affliction.’” See also Moorsom v. Moorsom, 3 Hagg. Ecc. 87, 93. It is there said that indifference, ill-behavior or cruelty is not pleadable in a suit for adultery. It will not justify her criminal misconduct. The same rule was applied by Dr. Lushington in a very strong case of willful desertion by a husband of a young wife—a girl of nineteen—of great personal beauty, recently married, and by the desertion, left, as the judge said, not merely to the risk, but almost to the certainty of destruction (Morgan v. Morgan, 3 Curteis Ecc. 679, 689).
If, however, it should turn out that I am wrong, and that Mrs. Uhlmann is innocent, or if both Mr. and Mrs. Uhlmann are guilty, so that no total divorce can be had by either party, the charges for cruelty may *245 become important if on no other ground, then in reference to the custody of the children.
[After reviewing the evidence, and holding the charge of cruelty by Mr. Uhlmann not sustained.] Even if Mrs. Uhlmann should have established cruelty on Mr. Ohlmann’s part, there would be an apparently insuperable obstacle in the way of obtaining relief by way of separation. The Code provides, section 1765, that “ the defendant may set up in justification the misconduct of the plaintiff, and if this defense be established to the satisfaction of the court, the defendant is entitled to judgment.” This section is shown by Mr. Throop’s note to be an equivalent for the section of the Revised Statutes (53). That, section came up for construction in Doe v. Roe (23 Hun, 19, Gen. T. Supm. Ct. 3d Dept.). It was there held that adultery by the wife was a bar to a judgment of judicial separation on the-ground of cruelty. That was an item of ill-conduct or misconduct within the purview of the statute. It was argued by counsel against this view, that the wife would be left without redress. It was replied by the court, that resort could be had to the criminal law, but not to the remedy by way of judicial separation. To the same effect is Best v. Best, 1 Addams Ecc. 411, and Shackett v. Shackett, 49 Vt. 195. In Drummond v. Drummond, 2 Sw. & Tr. 269, it is held that a wife guilty of adultery cannot be a petitioner in a divorce court on account of any matrimonial offense of the husband (p. 274).
Having previously arrived at the view in this case, that Mrs. Uhlmann has been guilty of adultery, it would be impossible to hold consistently with these authorities that Mrs. Uhlman can have a limited divorce on the ground of Mr. Uhlmann’s cruelty, even had I found that such cruelty existed.
[The referee then proceeded to consider the charges Of cruelty and abandonment against Mrs. Uhlmann.] *246 These charges are found in the action in the court of common pleas, in which Mrs. Uhlmann is the plaintiff. There are three causes of action set forth in the complaint— two for cruelty and one for abandonment. The first cause of action (for cruelty) is set forth with a large number of specifications.. A number of these are for opprobrious terms and epithets without threats ; others contain language of a threatening nature; others still set forth blows in the face; others detail alleged conspiracies to maintain a suit or action for divorce, or to induce and cause the plaintiff to commit adultery with a woman named ; others charge acts of annoyance on the part of the wife to the husband when sick (and known to be so by her), increasing his illness. Others set forth acts designed to estrange the plaintiff’s children from him, and to cause them to treat the plaintiff with disrespect and contumely; others again allege abusive language by the wife to a governess in the family, and instructions on her part to the children to abuse and maltreat said governess. Again, it is alleged that Mrs. Uhlmann has encouraged the children to tell lies, and has taught them that there is no Grod ; that they will not be punished, and to tell all the lies they please. Finally, it is stated that Mrs. Uhlmann' has willfully and knowingly disarranged medicines kept in a private case by the plaintiff, included among which were poisonous prescriptions, with intent that he should take a wrong dose and suffer injury, although she had been commanded not to interfere with them. These various charges are set forth with specifications of times and places ; with an allegation that the acts complained of have caused the plaintiff great mental pain and anguish ; that in consequence he has become and is ill, and have caused him to apprehend personal violence, physical injury and danger to his life, and that *247 he believes that further cohabitation with defendant will be attended with danger to Ms life and health.
The statement of the second cause of action reiterates these specifications, and alleges that they render it unsafe and improper for the plaintiff to cohabit with the defendant.
The third cause of action states that the defendant abandoned the plaintiff on July 12, 1884, and left Ms house and went to her father’s house, where she has ever since remained and now is.
[After reviewing the testimony on the point.] Now, it would seem that Mrs. Uhlmann was privy to or connected with three distinct attempts to bring about adultery on Mr. Uhlmann’s part. The question is now presented, how far these acts fall under the words in the statutes of New York, specifying the causes for a limited divorce ? I have not the benefit of any specific decision upon this subject. Let it be hoped that such a presentation of facts is excessively rare, even in a divorce court. There is a charge resembling this in Graecen v. Graecen (1 Green Ch. 459). It was alleged that a husband, for the purpose of obtaining a divorce from his wife, negotiated a plan with, one A., by which A., after the wife had gone to bed, was to go into her room and get into her bed, and then witnesses were to be introduced into the room suddenly, and detect them in that position. The chancellor said if the charge be true, a more base attempt to ruin the character of the wife could not be conceived of, and should forever absolve her from all further obligations to him. The attempt of the husband to debauch a wife’s female servants has been declared to be a strong act of cruelty (Popkin v. Popkin, 1 Hagg, Ecc. 765, n). Why notan attempt by her to have her husband debauched ? This matter can only be disposed of, as far as I know, by a course of general reasoning. As I shall at the close of the review of the evidence consider the principles on *248 which the doctrine ol! ciuelty rests, 1 will defer the subject until that time.
[After review of the testimony upon the issue of cruelty, the referee proceeded to consider the rules of law applicable to the facts disclosed in the evidence, upon the issue of cruelty made by Mr. Uhlmann.] No satisfactory definition of cruelty (saevitia) of the old books has yet been framed. In fact, it has not been attempted, as so much depends upon the varying circumstances of the cases coming before the courts. No exposition of the subject has been more satisfactory and influential upon courts than the remarks of Lord Stowell in the various cases decided by him, and particularly in Evans v. Evans (1 Hagg. Consist. 35). This case was thoroughly argued and carefully considered in an elaborate opinion. On page 37 he says, “ The question occurs, what is cruelty ?” but immediately replies that, for sufficient reasons existing in this case, he shall decline the task of laying down a direct definition. “It is the duty, and consequently the inclination, of the courts to keep the rule extremely strict.” “ The causes must be grave and weighty, and such as show an absolute impossibility that the duties of married life can be discharged. In a state of personal danger no duties can be discharged, for the duty of self-preservation must take place before the duties of marriage, which are secondary both in commencement and obligation; but what falls short of this, is with great caution to be admitted.”
Here the rule i.s laid down with clearness that if the causes for which a divorce is sought involve personal danger—if they attack the great law of self-preservation, they are sufficient, as that is of primary and paramount obligation. It will be observed that this passage takes no account of the mode in which personal danger is caused. It is the fact of its existence that is material. The act charged may accordingly be *249 injurious to life, or limb, or health. The judgment then proceeds negatively to stare what is not cruelty, on page 88 :
“ What merely wounds the mental feelings is in few cases to be admitted where they are not accompanied with bodily injury, either actual or menaced. Mere austerity of temper, petulance of manners, rudeness of language, a want of civil attention and accommodation, even occasional sallies of passion, if they do not threaten bodily harm, do not amount to legal cruelty ; they are high moral offenses in the marriage state undoubtedly, not innocent surely in any state of life, but still they are not that cruelty against which the law can relieve.” After stating the grounds of this proposition, the court proceeds :
ie Still less is it cruelty where it wounds not the natural feelings, but the acquired feelings arising from particular rank and situation, for the court has no scale of sensibilities by which it can gauge the quantum of injury done and felt, and therefore, though the court will not absolutely exclude considerations of that sort, where they are stated merely as matter of aggravation, yet they cannot constitute cruelty, where it would not otherwise have existed.” The court particularizes under this class such acts as refusing the use of a carriage or the use of a servant, which may be in many eases extremely unhandsome, and extremely disgraceful to the character of the husband, still they are not .acts of cruelty—“ the great ends of marriage may very well be carried on without them ” (p. 89).
The coprfc then proceeds to say that these are negative descriptions of cruelty, but if it were necessary to lay down an affirmative rule, he would adopt this, which is found in the older cases. The danger of life, limb or health is usually inserted as the ground upon which the court has proceeded to a separation. . . . The court has never been driven off this ground. The *250 court has always been jealous of the inconvenience of departing from it, and the judge adds: “ I have heard no one case cited in which the court has granted a divorce without proof given of a reasonable apprehension of a bodily hurt.” He proceeds to explain the word “reasonable” in the above proposition as meaning that it must not be an apprehension arising merely from an exquisite and diseased sensibility of mind.
This very clear.and beautifully expressed statement makes cruelty consist in such acts as cause a reasonable apprehension of injury to life, limb or health, and perhaps includes other acts of such a nature that the “great ends of marriage ” are inconsistent with them.
In applying the principle laid down in this case to the great number of charges then before the court, Lord Stovvell mentions some which are in no way injurious except to health. In other words, in his view an act causing reasonable apprehension of injury to one’s health, and to the health alone, is an act of cruelty.
This is illustrated by a charge made against Mr. Evans by his wife that “ he obstructed the circulation of the air by shutting the doors.” The court said “Certainly that may be cruelty, because health may be affected by it; life may be destroyed by it.”
Another charge which the court admitted as cruelty was that while Mrs. Evans was in a very weak and sickly state, Mr. Evans, to distress her and increase her pain, made a violent noise with a hammer close to her.
There was also a specification concerning foul clothes being brought into Mr. and Mrs. Evans’ apartments, which the court admitted on the ground of its being associated with other articles (charge 1) of more weight. The court said that this was allowed, because where there are charges of great strength in their own nature, the court is always less delicate about admit *251 ting slighter charges which it would not have admitted singly and standing by themselves. It then added, to be sure it might be an act of cruelty if Mr. Evans brought large collections of loathsome clothes in a very hot climate into the apartment of a person extremely sick, or without any signal convenience. The principles of Evans v. Evans (supra), were fully adopted in Westmeath v. Westmeath, highly important case, in 2 Hagg. Ecc. (Suppl.) 56, 70, 71.
Thus far the attention has been directed to acts. It is now pertinent, to inquire how far words alone can be regarded as cruelty. It is laid down in Oliver v, Oliver, 1 Hagg. Consist. 361, that words of mere present irritation, however reproachful, will not enable the court to pronounce a sentence of separation. . . . Words of menace importing the actual danger of bodily harm will justify the interposition of the court, as the law ought not to wait till the mischief is actually done. But the most innocent and deserving woman will sue in vain for its interference for words of mere insult, however galling (p. 364).
So in Kirkman v. Kirkman, 1 Hagg. Consist. 409, it is stated that the court will not release the parties from cohabitation for mere words of abuse, however reproachful (see also Harris v. Harris, 2 Hagg. Consist 148).
But on the other hand it is said in the same con nection that the persons of both parties are to be protected from violence, and the court is not to wait until there has been actual violence of such a nature as may endanger life. Words of menace, if accompanied with probability of bodily violence, will be sufficient. If there be a tendency only to bodily mischief, it is a peril from which a party must be protected (Holden v. Holden, 1 Hagg. Consist. 453, 458). “ It may be enough if they are such, as inflict indignity and threaten pain.” The court here seems to *252 draw a distinction between words of abuse of a reproachful nature and such as “inflict indignity.” In accordance with this distinction the court lays much stress in the course of the decision awarding a divorce upon opprobrious words used by the wife— enumerating and italicizing them—suchas rogue, villain, blackguard, dirty dog, white-faced villain, French villain, scoundrel (Kirkman v. Kirkman, supra, pp. 411, 413).
A further inquiry is as to whether a single act of cruelty will suffice. The court has expressed an indisposition to grant a divorce for a single act, particularly of a slight kind, and where persons have long cohabited, and this on the ground that it may be presumed that it will not be repeated. But it is only on this presumption ; for if there be one act of such a description that the court thinks it is likely to occur again, and that with real suffering, there is no rule which should restrain it from interfering (Holden v. Holden, 1 Hagg. Consist. 458; Popkin v. Popkin, Id. 765, n.).
The court again lays stress upon opprobrious words in Harris v. Harris, 2 Hagg. Consist. 148:
“There must be something which renders cohabitation unsafe, or is likely to be attended with injury to the person or to the health of the party in order to sustain an application to this court (divorce). Words of menace may partake of either of these characters; they may merely be the language of passion, or they maybe the expression of determined malignity, which, if they are likely to be carried into effect, may warrant the court to interpose and prevent the actual mischief which is thus threatened. Where such violence of language is accompanied with blows, it is a more aggravated case, and the mischief is actually inflicted (Harris v. Harris, 2 Hagg. Consist. 149).
In Clarkes Praxis, a highly respectable author *253 ity, a case of cruelty is put in this way. It is cited in Westmeath v. Westmeath, 2 Hagg. Ecc. (Suppl.) 69, 66 si maritus uxorem inhumaniter verbis et verberibus tractaverit, et aliquando venenum loco potus paraverit, vel aliquod simile commiserit, propter quod mur lies', sine periculo vita cum marito cohabitare axit obsequia eonjugalia impenderé non audeatThis passage refers to words of an opprobrious kind, and to the act of placing poison where a party might drink it.
In Westmeath v. Westmeath, 2 Hagg. Ecc. 72, it is said by Sir John Nicholl, on appeal, that it is not necessary that the conduct of the party applying for the divorce should be entirely free from blame, for the reason which would justify the imputation of blame to one will not justify the ferocity of the other, citing Holden v. Holden, 1 Hagg. Consist. 453. There must be ill treatment and personal injury, or the reasonable apprehension of personal injury. What must be the extent of the injury, or what will reasonably excite the apprehension, will depend upon the circumstances of each case. So, likewise, what may aggravate the’ character of ill-treatment must be deduced from various considerations—in some degree from the station of the parties, in some degree from the condition of the person suffering at the time of the infliction. The complexion of individual acts may be heightened, nay, the acts may almost change their very essence, by the accompaniments. Not only particular stations and situations, and the feelings almost necessarily arising out of them, but even acquired feelings, may be entitled to some attention where they are stated merely as matter of aggravation, citing Evans v. Evans, supra. On page 73 it is stated that blows between parties in the lower conditions and in the higher stations in life bear a very different aspect.
The state of one’s health and occasional acute suf *254 fering was taken into account in Lockwood v. Lockwood, 2 Curteis Ecc. 281, 294 and 302, 2d paragraph.
It may reasonably be made a question whether Lord Stowell, in Evans v. Evans, supra, exhausted all the cases in which a court is justified in granting a divorce for cruelty. He most accurately marked out the extreme limits on either side; personal injury and menace were enough. Mere words of abuse, want of civil attention, petulance of manners were not enough. There is, however, a wide intermediate land between these limits, which is left without specific definition. There is a thought suggested by him in the discussion to this effect: that if the act of a party be such that the great ends of marriage cannot be carried out, there may be ground for a divorce (1 Hagg. Consist. 39). It must be remembered that “ cruelty” is not a popular word in this connection, but a technical or legal word. Much confusion would seem to have arisen from not attending to this distinction. Why should the divorce court force people to cohabit, when in their cohabitation the “ great ends of marriage” cannot be carried out, owing to the wrongful act of one of them ? Of course, care must be taken in the application of such a doctrine that the acts complained of be in their nature plainly subversive of the marriage relation. When such facts exist, there would seem to be good reason for the interference of the court.
To this effect is Harratt v. Harratt, 7 N. H. 196. The court refers to acts showing that the “ duties of married life cannot be discharged.” It also adopts the rule in Evans v. Evans, supra, as to reasonable apprehension of danger to life, limb and health. While insulting and degrading language may not in and of itself be a ground of divorce, it may be used in aggravation (Folmar v. Folmar, 69 Ala. 84; Ward v. Ward, 103 Ill. 477; Farnham v. Farnham, 73 Ill. 497; Day v. Day, 56 N. H. 316). In furtherance of this *255 view, it was held in Close v. Close, 25 N. J. Eq. 526, that, together with opprobrious words, any physical injury would suffice. A false and public charge of adultery is cruelty (Graft v. Graft, 76 Ind. 136; Smith v. Smith, 8 Oreg. 100; see also Kennedy v. Kennedy, 73 N. Y. 369). It was held in Otway v. Otway, 2 Phillim. 95, that opprobrious words, such as false charges of adultery" and incest, might be regarded as words of menace.
So Whitmore v. Whitmore, 49 Mich. 417, holds that a husband is entitled toa divorce for “extreme cruelty,” where his wife has, without cause, constantly and publicly charged him with unfaithfulness, disgraced him and injured his means of livelihood..
Prichard v. Prichard, 3 Sw. & Tr. 523, seems to rest on the proposition under consideration. The court said that it was not sure that it ought to draw the conclusion that the safety of the husband was imperiled. The judge said: “I do not believe that the wife ever intended or is likely to do him harm by personal violence. But the violence of the husband and similar conduct in the wife hardly deserves to be considered in the same identical light. . . . But if the physical effects of the violence of the wife are less, the moral results are immeasureably greater. Cohabitation on the terms of the marriage contract ceases to be longer possible.” The judge goes on to say that even the safety of the wife requires that the husband should be relieved from the torments of provocation, which might in the end result in an act of retaliation.
There are expressions leading to the same general conclusion in Davies v. Davies (37 How. Pr. 43); Latham v. Latham (30 Grattan, 307, 321), and Lynch v. Lynch (33 Md. 328).
The rule laid down in Evans v. Evans as to injury to health being an act of cruelty, is followed in Perry *256 v. Perry (2 Pai. 501), and in Kennedy v. Kennedy (47 Super. Ct. [J. & S.] 56, 60).
The rule in Kirkman v. Kirkman (supra), as to words of menace and words of indignity being sufficient, is adopted in Whispell v. Whispell, Parker, J. (4 Barb. 213).
I think that a fair summing up of the law of “ cruelty,” as now applied, is as follows :
Cruelty is a wrongful act or omission by one of the parties, inconsistent with the discharge of the duties of married life. It may be either:
A. An act causing or threatening personal injury to life, limb or health.
B. It may be words inflicting indignity and threatening pain. This statement does not include mere words of abuse, though it may mean opprobrious words by way of aggravation.
C. A single act of a sufficiently aggravated character may suffice. Where acts are not so highly aggravated, a number may be considered together as showing a course of conduct. Where an act falling within the exposition of cruelty is proved, minor acts of a similar kind may be shown by way of aggravation. Even acquired feelings may be taken into account in this way.
D. In general, a wrongful act- or acts plainly subversive of the marriage relation, and making it impossible that the duties of married life be properly discharged, will be-an act of “ cruelty,” though it does not strictly fall within the cases just indicated in A and B.
I now proceed to apply these principles-to the case at bar.
There being a large number of acts proved in this case, they may be considered together as showing a course of conduct. This rule is well stated in Burgess v. Burgess (2 Hagg. Cons. 233), as applied to several *257 acts of familiarity under a charge of -adultery. The court said that “it has been argued that one was an isolated and detached fact; that another was so likewise, and that none of them led to a conclusion of crime. But this is not the proper way to consider such evidence ;the facts are not' to be taken separately only, but in conjunction ; they mutually interpret each other ; their constant repetition gives them a determinate character.” . These remarks are in their general nature applicable to many of the charges agamst Mrs. Uhlmann. The acts complained of mutually interpret each other. This rule has been applied to a series of charges of cruelty in Briggs v. Briggs (20 Mich. 34); Richards v. Richards (37 Pa. St. 225); Chesnutt v. Chesnutt (Spink Ecc. & Adm. 196). In this last case a number of acis not singly amounting to legal cruelty were taken together, and a divorce for cruelty granted.
[As to the charges, which were sustained, of privity with a conspiracy to induce Mr. Uhlmann to have sexual intercourse with a prostitute at the hotel where he resided, and privity on Mrs. Uhlmann’s part with a conspiracy to cause him to be found in equivocal relations with a woman not his wife on a railroad train, and then to maintain an action of divorce on the evidence thus obtained, the referee observed :] .
I do not think that they fall within any definition or exposition of cruelty which makes actual or threatened physical injury to life, limb or health necessary. I think they do come under the proposition which I have discussed, that “ cruelty ” includes such acts as render the proper discharge of the duties of married life impossible. They would convert a house into a hell, destroy all confidence between man and wife, die sever any bond of union between the parties, prevent the proper education of the children, both intellectual and .moral, make their life a torment, and bring the unhappy husband into a condition of constant suspic *258 ion and nervous apprehension, which might in some cases lead to permanent injury to health. If there is any act of cruelty surpassing such an act, one would-like to have it named.
[After reference to other specifications.] Taking all these charges into account, I cannot hesitate to pronounce this as a case falling within the terms of section 1762 of the Code of Civil Procedure, authorizing a limited divorce for cruelty and inhuman treatment, and for such conduct as renders it unsafe and improper for the husband to cohabit with the wife. I only add that if I am wrong in the view that all the charges are sustained by evidence, there may still be a divorce, if any of them of sufficient gravity are sustained (Lockwood v. Lockwood, 2 Curteis Ecc. 281).
This case closely resembles, in some of its leading features, the case of Kirkman v. Kirkman (1 Hagg. Cons. 409). There were, in that case, many opprobri ons epithets, though not so opprobrious as in this case ; there was a blow in the face also. There was one act of a more severe nature. Mrs. Kirkman tore her husband’s cheeks with her nails so as to make them bleed. There is no evidence that Mrs. Uhlmann did any such act as this last named. On the other hand, there is no conspiracy in Kirkman v. Kirkmann against his peace or honor; there was no attempt to usurp the headship of the family ; there was no abuse of a governess ; there was no training of the children to abuse the father, and to revile his methods of household management;
I think the Kirkman case less strong than this, but the court said, “The evidence established that the wife is not mistress of her own passions, and the court would be wanting in due attention to the safety of the injured party in this case if it did not pronounce for a separation as absolutely necessary for that purpose.” So must it be said in this case. It was urged in argu *259 nient, and there was a great amount of testimony to that effect, that Mrs. Uhlmann was so affectionate a mother and devoted to her children that the allegations made against her could not be true. This same claim has frequently been made in other cases. A woman may be extremely kind and tender to her children and display absolutely opposite qualities to her husband (See Harris v. Harris, 2 Hagg. Consist. 149; Kirkman v. Kirkman, 1 Id. 409, 413).
There is but one more matter left, and then I may dismiss the consideration of this case.
The third cause of action .set forth in Mr. Uhlmann’s complaint is that on February 12, 1884, the defendant abandoned the plaintiff and left his house and went to her father’s house, and where she has ever since remained and now is (34th paragraph).
Section 1762 (Code of .Civil Procedure), gives as a third ground for a judicial separation <£ the abandonment of the plaintiff by the defendant.”
The facts shown are that while Mr. Uhlmann was away from his residence, . . . Mrs. Uhlmann, on February 12, 1884, went without his consent to her father’s residence, . . . and has there remained. The question is, whether this was an abandonment in the sense of the statute. There is but little adjudication upon this point, as the statute is recent. Usually in statute law the word “desertion” is used in such cases. It will be observed that no length of time is required to constitute an abandonment in this section. An English statute and some of our own statutes on desertion avoid a question by specifying a desertion for a term of years. It would seem that “desertion” and “abandonment” would be practically equivalent, and that the decisions as to “ desertion” for a specified time could be resorted to for construction, since there must be a desertion before the years can begin to run.
*260 It seems to me, that to constitute an abandonment under the statute two elements are necessary.
One is a final departure with the intention not to return. This intention may be shown expressly or may be implied by conduct. 1 think there is sufficient evidence of intent in the present case, as shown by the mode and circumstances of departure, including the removal of effects and the commencement of the action for divorce in the supreme court, while away, and also the acts of her father while she was in the house, of preventing entrance to it through Mulroy. The next essential fact I think is, that there should be no sufficient reason for leaving. A man might maltreat his wife to the last point of endurance by personal abuse, or,—as in Harwood v. Heffer, 3 Taunt. 421,—bring a mistress into the house to annoy her, and so forth, and she might rightfully leave in consequence. This would not be abandonment within the meaning of the statute, which must contemplate a wrongful or unjustifiable act of leaving. ■ It is scarcely necessary to add that the other party must not consent to the act of leaving. That is not pretended in this case. Assuming, that the elements named must exist, I think that they are found in the present case, and accordingly that there was an abandonment within the meaning of the section cited.
There is, accordingly, good ground for separation in this aspect of the case.
I may refer to some decisions on the subject - of desertion.
It is stated in Sergent v. Sergent, 33 N. J. Eq. 204, that three things are necessary to an act of desertion : (1) Cessation of cohabitation ; (2) The intent in the mind of the, defendant; (4) That there is not consent on the part of the complainant. To the same general effect is Kennedy v. Kennedy, 60 How. Pr. 151; Pilgrim v. Pilgrim, 57 Iowa, 370; Rose v. Rose, 50 Mich. *261 93). It is also held in Ward v. Ward, 1 Sw. & Tr. 185, that the desertion must be against the will of the party complaining of it. 16Abandonment” is defined in Orr v. Orr, 8. Bush (Ky.) 156,. as a fixed determination to leave cohabitation without cause.
The test seems to be to determine the intent at the time of departure, for if the desertion be in itself complete, a subsequent offer to return will not avail, as the deserted party has a legal right of which he cannot be deprived without his concurrence. This was so held in England after the period of two years had elapsed (there required), but the principle would seem to be the same in I he New York statute, where no time is required (Cargill v. Cargill, 1 Sw. & Tr. 235).
The circumstances and manner of departure may properly be considered to show the intent (Cook v. Cook, 13 N. J. Eq. 263; Rogers v. Rogers, 18 N. J.Eq. 445).
• On these general grounds I am of opinion that the cause of action based on abandonment is sufficiently proved. There is, in my judgment, a combination of all the elements required to constitute desertion or abandonment—a departure with intent to leave finally all cohabitation and against the will of Mr. Uhlmann.
The i>laintiff, Mr. Uhlmann, is accordingly entitled to a limited divorce from his wife, Mrs. Uhlmann, on each and all of the grounds set forth in his corn-
il. N. Y. Superior Court, Special Term.
Motion to confirm the report of the referee and for judgment.
Roger A. Pryor, for the plaintiff.
Wetmore & Tenner, for the defendant.
O’Gorman, J.
—This is a motion on the part of the defendant to confirm the report of a referee, and for *262 judgment with costs, and for such other relief as may be just.
The motion is made in compliance with section 1229 of the Code of Civil Procedure,—which provides that the testimony and other proceedings on the reference must be certified to the court by the referee with his report, and judgment must be rendered by the court,— and also in compliance with general rule of court 77 (formerly 92),—which requires that “judgment shall be entered on the special direction of the court.”
In ordinary actions, no- such direction of the court is required ; as to them the report of a referee on the whole issue stands as the-decision of the court, and judgment is entered thereon, as if the action had been tried by the court.
In divorce cases, however, this supervising power is vested in the court as a precaution against fraud or collusion, or failure to comply with the various special statutory requirements as to the conduct of actions for divorce (Sullivan v. Sullivan, 41 Super. Ct. [J. & S.] 519, 521). In the exercise of this supervising power this court at special term may order a new trial (Harding v. Harding, 43 Super. Ct.[J. & S.] 27, 35). But that should not be done if there is enough on the whole case to show that the decision of the referee was substantially right.
A new trial should not be awarded in an action for divorce unless for substantial errors showing that a fair trial has not been had. The law of divorce would be useless to the innocent party, and destructive to the public if new trials were granted upon slight or sharp exceptions that astute counsel may take in the progress of a protracted investigation of matters of fact.
The inquiry in a court of equity is, “Is there enough upon the whole case to show that the report is substantially right V’ (Forrest v. Forrest, 25 N. Y. 501, 610.) An appeal from the judgment when entered *263 still lies to the general term of the court, and on that appeal errors in (he trial may be corrected (Code Civ. Pro. 1348).
I have considered, with care, the earnest and able arguments, both oral and written, addressed to me by the learned counsel for both parties, on this motion, and the evidence and the report and findings of the referee in this action, and I have come to the conclusion that no irregularity has been committed in the proceedings; that the various statutory requirements have been complied with ; that the referee’s findings of fact are supported by sufficient evidence ; that his conclusions of law are sustained by his findings, and that on the whole case substantial justice has been done.
The motion for judgment, in favor of the defendant and against- the plaintiff, must be granted.
As to the question of the disposal of the two children of this marriage, the legal position of the controversy seems to be this: The husband is always prima facie entitled to the custody of the children,. Judgment of divorce against the wife for adultery dissolves the marriage tie (Kamp v. Kamp, 59 N. Y. 212), and makes the husband’s right absolute and unquestionable.' Where the wife obtains judgment of divorce against her husband, the judgment may require the defendant to provide for the maintenance and education of the children of the marriage (Code Civ. Pro. § 1759).
But where, as in the case at bar, the judgment of divorce is against the wife, there is no express provision of law enabling the court to give the custody of' the children to her. The court must either by order before or in the final judgment give such direction as justice requires between the parties as to the custody and education of the children (Code Civ. Pro. § 1771).
. It is held that after a divorce granted to the bus- *264 band for the wife’s adultery, and the award to him of the custody of the child, the court cannot, by modification of the judgment or otherwise, order that the wife be allowed to see the child (Crimmins v. Crimmins, 28 Hun, 200, 201).
Under these provisions and rulings, the right of the husband here to custody of the children seems to me to be absolute, unless the good of the children themselves clearly requires some other disposition of them.
[The learned judge then adverted in some detail to the facts, and approved the finding of the referee; and concluded as follows:]
In obedience, therefore, to the requirement of the law, I direct and decree that the report of the referee herein be in ail things confirmed ; that judgment of absolute divorce be entered against the plaintiff and for the defendant, with costs, and that the défendant —the father of these children and their natural guardian—have the custody of them and the care of their education without any interference or hindrance from the plaintiff.
III.' N. T. Common Pleas, Special Term.
The report of the referee was confirmed on motion, Alleu, J., saying: “The court at special term has not the power to review the findings and the decision of the referee ; this can only be done by appeal to the general term (Ross v. Ross, 31 Hun, 140; Schroeter v. Schroeter, 23 Id. 230; Anonymous, 3 Abb. N. C. 161).”