1841.

HANKS
*v.*
HANKS.

HANKS *v.* HANKS.

Testimony, whereon to obtain divorce for adultery, should be full and explicit and the proceedings ought to show that the suit is not got up by collusion. Such a divorce should only be had where one party is innocent and aggrieved.

THE bill was filed for divorce on the ground of adultery. On the coming in of the master's report,

*April* 27, 1841.

HIS HONOR observed :—In this case, I am not satisfied with the testimony as to the alleged adultery. It is true, that one of the witnesses testifies positively to the fact from his own observation. But in order that a witness's story may be believed, it should, at least, be credible in itself and not such as to involve a seeming impossibility. It is not sufficient that a witness swears to a fact, when, at the same time, it appears from his own relation of it, that he was not in a situation to see or know the fact he speaks of. This seems to be very much the case in relation to the principal witness, as to what he deposes to have seen while looking through a window from eleven o'clock at night until three o'clock in the morning. How could he have seen through that window, when he was standing in a dark alley and there was no light, either from fire or candle, in the room ? He says it was a moonlight night ; but he does not say or pretend that the moon shone into the alley and extended her rays into the room. In another part of his examination he says it might have been only a starlight night ;

*Husband and wife. Divorce. Evidence.*

and hence the less probability of his accuracy as to what he pretends to have seen. There are also other circumstances, which, instead of corroborating, go to detract from the credibility of the witness and leave it still more doubtful whether the act of adultery was committed by the defendant. True, the defendant has suffered the bill to be taken as confessed, but this is not a sufficient ground for the court to make a decree.

A due regard for public morals requires that, before the court proceeds to dissolve a marriage, it should be satisfied not merely that the delinquency has happened, but that there is no collusion between the parties in laying a foundation for the suit and in bringing it before the court. Parties bound together by the strongest ties, may, in moments of irritation and disappointment, become dissatisfied with each other and be mutually willing to be divorced ; and then, resorting to this court, find great facility in carrying a proceeding through upon bill taken pro confesso ; and from the frequency of applications of this sort, I am convinced it is the duty of this court to hold a strict hand over the proceedings, and not to grant a decree which is to absolve them from their marriage vows, except where the complaining party is entirely innocent and is really aggrieved by the misconduct of the other and seeks the relief which the law affords from a sincere desire to avoid a greater shame.

Dissolving a marriage contract, once solemnly entered into and consummated, has been regarded by many as a matter of doubtful policy in the law of any refined and well regulated society. In England, it is not done except upon an application to parliament and by a special act to meet the individual case. There, a judicial sentence, even for the cause of adultery, can only authorize a separation from bed and board. In France, during the first revolution, an unlimited power was given to the civil tribunals to dissolve marriages whenever applications were made founded upon the mutual consent of parties or at the mere pleasure of either party, on a month's notice, upon the ground of alleged incompatibility of temper. A writer on the subject remarks that fortunately for that country, perhaps for mankind, this system was not permitted to endure sufficiently long to make the full experiment of moral degra-

dation to which a nation, once the most polished and refined, could be reduced by the existence of a license for almost promiscuous concubinage ; and Mr. Burke, in one of his *Letters on the Regicide Peace,* has shown the frightful extent to which divorces were carried under that system. The number of divorces in the city of Paris alone, in the first three months of the year 1793, was nearly five times as great as the whole number of divorces or judicial separations granted in England in the course of an hundred years.

When the Code Napoleon came to be adopted, the subject of divorce was placed upon nearly the same footing as it stands at this day in our state. A dissolution of the marriage for the cause of adultery was thereby allowed. But after the restoration of the Bourbon dynasty, it was deemed expedient to depart from the system of indulgence afforded by the Code Napoleon ; and by a law of the 8th of May, 1816, which constitutes a part of the law of that country at this day, divorce was abolished and, as in England, a judicial sentence of separation from bed and board only is allowed, for any definite cause. In France, therefore, where the experiment has been tried, they have gone back to what they deem the soundest and best policy in regard to public morals and the sanctity of the marriage contract, which is held to be indissoluble except by death. Whether it would be wiser and better or more conducive to the good order and well being of society for the legislature of this state to act upon that principle and to take from the courts the power to dissolve marriages, is not for me to say ; but it certainly becomes the court, entrusted with the exercise of this power, to see that something more than the mere forms of law are observed in these proceedings and that the use and abuse of the right to apply are not confounded.