SYLVESTER GRAHAM

v.

LYDIA A. GRAHAM.

1. Evidence that a married woman, without her husband's knowledge, frequently went by day to the boarding-house of another man, who worked at night and remained at home during the day, having introduced herself and being known there as the wife of such man, and remained hours in his bedroom with him alone, in connection with other testimony indicating unchastity, is sufficient to prove the commission of adultery, notwithstanding her denial thereof under oath.

2. Statements made by an alleged paramour are not evidence against the defendant, but may be shown in contradiction of his testimony on the trial to affect his credibility.

3. Although, after the commission of adultery by the wife, the husband continued to dwell with her in the same house, the burden is on the wife to prove condonation, if the husband denies marital intercourse.

4. The injured party must have reasonable knowledge of the offence of the guilty to establish condonation.

The petition is filed for divorce on the ground of adultery. The defence is a denial of guilt and condonation. The offence is charged with requisite particularity to have been committed with one person named Stiles, in Bordentown, and with another named Kirby, in Philadelphia. The evidence showed that the defendant had lost any affection she ever had for her husband; that Stiles and other men were permitted by her to indulge in acts of familiarity inconsistent with her marital duty. A tendency to be unchaste was indicated by lascivious conduct and impure conversation. The evidence in support of the first charge was both positive and circumstantial. As to the second, it was mainly that the defendant had introduced herself into Kirby's boarding-house as his wife; had gone to his bed-room and been admitted by him, where they remained alone together for more than an hour; that such visit was repeated several times in the daytime, and on one or two occasions at night, when she claims Kirby was not at home.

*Mr. Samuel W. Beldon,* for the petitioner.

*Mr. Horatio N. Barton,* for the defendant.

GREEN, V. C.

(After examining and commenting on the evidence at length.)

It is claimed that evidence that the defendant frequently visited Kirby in his bed-room and remained there with him, is not sufficient evidence of adultery, and *Williams* v. *Williams, 1 Hagg. Cons. 299,* is cited in support of that contention. In that case the husband having forbidden the alleged paramour, Thomas, to come any more to his house, Thomas took lodgings, and the wife visited him there, and stayed a considerable time, and they passed there for husband and wife. Lord Stowell, distinguishing the case from that of *Eliot* v. *Eliot, Cons.,* says (at *p. 302*): "It is not proved as assumed, that she took the name of Mrs. Thomas; he called her so, and said that she was his wife, but it is not proved that she called him her husband, or that she knew that he called her his wife; he might speak of her in that name, but

that will not show her knowledge of the fact. The only circumstance of clandestinity which is proved is, that Thomas attended her almost to her own house, and then left her; but that the court should infer that this happened from a clandestine intention, or that it might not be by accident, is, I think, not warranted by any rules of evidence on which this court can safely proceed. The question then comes to this: Does the visit of a married woman to a single man's lodging or house, in itself, prove the act of adultery? There is no authority mentioned for such an inference, but the case of *Eliot* v. *Eliot*, which is open to the distinction, arising from the character of the house in that case, which is too obvious to be overlooked. It would be almost impossible that a woman could go to such a place, but for a criminal purpose; but in the case of a private house, I am yet to learn that the law has affixed the same imputation on such a fact. In a late case of *Ricketts* v. *Taylor*, in the king's bench, the visit of the wife to a single man's house, combined with other circumstances, was held sufficient. In that case the windows were shut, and there were letters which could not be otherwise explained. That case, therefore, is no authority in this inquiry, and though the court might be induced to think that such visits were highly improper, it must recollect that more is necessary, and that the court must be convinced, in its legal judgment, that the woman has transgressed not only the bounds of delicacy, but also of duty. There is nothing stated of any improper conduct in the observations that were made upon the conduct or behavior of the parties at this lodging—no description of the bed-room, or any such circumstance; and, if there had been such appearances, it is scarcely possible that they should have been forgotten; but none are brought forward that can induce a presumption of any conjugal act. The whole amount of the evidence on this article is, that she visited at these lodgings, not calling herself Mrs. Thomas, and not knowing that they were not his ordinary lodgings—without any other proof of clandestinity than that, on two or three occasions, he did not accompany her quite to the house of her husband." I have given this extract thus fully from Lord Stowell's opinion, to show wherein he thought that

case did not contain the circumstances which led to a different result in *Ricketts* v. *Taylor*, which case is not, as far as I can ascertain, elsewhere reported. *Hunt* v. *Hunt, Deane & S. 121*, was also referred to by counsel. There it is certainly intimated that the fact that the wife was alone in the room with her alleged paramour was not, under the circumstances, sufficient proof of adultery, but Bishop says of that case (*2 Bish. Mar. D. & S. § 1360*):

"The proofs against the wife seemed conclusive, and plainly the judgment that she was an adulteress would have been pronounced, and the grievous consequences would have fallen upon her, but for her ability to prove at the trial, beyond the possibility of contradiction, that even then, and after she had cohabited with her husband eight years, she was a virgin."

*Whitenach* v. *Whitenach, 9 Stew. Eq. 474*, was also cited, but the only portion of the opinion bearing on the point is as follows: "Perhaps the mere fact that these persons were together in lonely places, or that they were frequently together at night at the home of the defendant, when her husband was absent, would not of itself, standing alone, furnish evidence sufficient to justify the court in declaring that they had committed adultery." The result of the authorities cited is that the mere fact that a married woman visited a man, other than her husband, at his lodgings, without other incriminating circumstances, is not sufficient evidence to convict her of adultery. In the case in hand there are such circumstances. This bed-room of Kirby's was removed from frequent interruption. It was on the third floor. Her visits to him were clandestine so far as her husband and her family were concerned. She visited him when her absence from home was ostensibly for other purposes, and, although he had been an acquaintance at their own house, she never mentioned the fact of their renewed meetings to her husband. She passed at Kirby's boarding-house as his wife. She has not the answer that Mrs. Williams had in *1 Hagg. Cons., supra*, for she introduced herself into the house, and obtained access to his bed-room, by assuming the relation of wife to him, and was publicly introduced to the members of the family as Mrs. Kirby. She visited him when he was presumably in bed, for he worked all

Graham v. Graham.

night until seven o'clock in the morning, when he returned to his lodging-house, got his breakfast and retired, and her visits, she says, were about ten or eleven in the morning. Her first visit was evidently not by appointment, for he was surprised when he saw her. She went to his room, after waiting in the reception-room on the first floor, not sending for him to come there or to the parlor, but sought him in his bed-chamber. If she had innocently gone to his bed-room on the first occasion, she had no such excuse on the subsequent visits she made. She undressed and dressed in his room, and for one night at least, if not two, occupied his bed. She admits he made indecent proposals to her on the boat, according to Warford and Mrs. Wenrich the same night she went with him home, and certainly visited him October 17th, remaining more than an hour, according to Lyman. These facts, taken in connection with what has been pointed out as to her conduct with others, particularly with Stiles, leaves no room for doubt that desire and opportunity met on the occasions of these visits to Kirby's bed-chamber, with the presumable result.

It is true the defendant and Stiles deny the adultery under oath, and I think she proves her inability to produce Kirby as a witness. But this evidence, while competent, weighs but little in the face of positive proof and overwhelming circumstances. A question of the admissibility of contradictory statements by Stiles was reserved. I think the weight of authority is that such statements may be admitted as contradictory of the testimony of the witness, but not as bearing on the main charge. I have, however, in the consideration of the case, given the testimony objected to no weight.

But it is claimed that the husband has condoned the offence. It is urged that the petitioner has solemnly admitted it in his petition and papers used on a motion for alimony. As originally filed, the petition did state that the petitioner and defendant had continued to reside together as man and wife, up to the time of verifying the petition, but on representation by his counsel that the words "as man and wife" were inadvertently used to mean simply that they lived in the same house together, an

45

amendment was permitted striking those words out. Defendant's counsel put the original petition in evidence to establish such admission; but while it may have probative force to the extent that petitioner had made such admission, in the light of his explanatory evidence, and that of his counsel, it cannot be of much moment. As Vice-Chancellor Van Fleet says, in *Warner* v. *Warner*, *4 Stew. Eq. 225, 226*, " Courts of equity do not permit truth and right to be sacrificed to preserve form, nor allow justice to be defeated, and wrong to triumph, on a mere mistake or unskillfulness in pleading."

It is, however, the fact that these parties were domiciled in the same house up to Thursday the 22d day of October, 1891, the day the petition was verified. It is contended by the defendant's counsel that, the parties not having ceased to reside in the same dwelling, the burden of proof is on the petitioner to show that the wife's offence was not condoned by him; and that this requirement, imposing the burden of proof upon him, cannot be answered by the testimony of the petitioner alone, but that the same corroboration is necessary thereto as is required to establish the grounds upon which divorce is to be decreed. I do not so understand the law. Condonation in divorce proceedings is a defence, the burden of the proof of which is upon the party setting it up. The exceptional rule requiring corroboration of the testimony of the parties to the suit, as to the facts relied on as grounds of divorce, may, with propriety, be applied to a party who sets up condonation as a defence; but the *prima facie* case of condonation having been made out, there is no reason why it cannot be met with the same measure of proof as in ordinary cases.

But counsel for defendant claims to have made out his defence of condonation by a preponderance of evidence. He first invokes the fact that the husband and wife occupied the same house down to the 22d of October. Condonation is inferred from the fact of sexual intercourse after knowledge of guilt. *Browne Dig. Div. .31.* The general presumption is that husband and wife living in the same house, live on terms of matrimonial cohabitation. *Beebe* v. *Beebe, 1 Hagg. Ec. 789; Marsh* v. *Marsh, 2 Beas. 281, 285; Burns* v. *Burns, 60 Ind. 259.* But this, as every other

Graham v. Graham.

presumption, may be met and overcome by proof of facts or circumstances which destroy the probability, from which presumption springs, that married persons living in the same house maintain marital relations. Thus, if it is established satisfactorily that the parties occupied separate apartments, or that there was no access, the presumption is entirely destroyed, and I know of no rule of evidence which requires any different proof to overcome such presumption, than that which obtains with reference to ordinary questions of evidence. In the case of *Stevens* v. *Stevens, 1 McCart. 374,* cited by counsel, the bill was filed for divorce on the ground of adultery. The bill stated that the parties lived together as man and wife until a period subsequent to the adultery proved, and there was no express and unequivocal denial of the wife's previous knowledge of the husband's guilt in the bill or in the wife's evidence. The chancellor said : " The language both of the bill and of the evidence is cautious and guarded. It all may be true, and yet the complainant may, for years before she ceased to cohabit with her husband, have had certain knowledge of his infidelity." He says further : " Where it appears that the wife has continued to live with the husband after the offence charged is proved to have been committed, there should be facts or circumstances to show that the offence has not been condoned, or a clear, express and unequivocal denial by the complainant of knowledge of her husband's infidelity during the continuance of their cohabitation, and a report by the master adverse to the condonation (*Dodge* v. *Dodge, 7 Paige 589 ; Dobbs* v. *Dobbs, 3 Edw. Ch. 469; Kane* v. *Kane, 3 Edw. Ch. 389*)—it is true that there is no rule of this court similar to that of the court of chancery of New York which requires that the bill shall aver that the complainant has not cohabited with the defendant since the discovery of the adultery—but where it appears upon the face of the bill that cohabitation between the parties continued long after the adultery is proved to have been committed, there should be an express denial on the part of the complainant of voluntary cohabitation since the discovery of the defendant's infidelity, or such facts and circumstances should be shown as to preclude a condonation of the offence."

Graham v. Graham.

In that case there was not only joint domicile of the parties but actual cohabitation admitted by the bill, and not followed by a denial of knowledge of defendant's guilt, during such cohabitation. The difficulty was, not that the complainant did not make out a case, but that she went further and suggested facts which presumed a defence, and then did not rebut it. If the bill had denied knowledge of the offence until after cohabitation had ceased, and that had been sustained by the testimony of the complainant, it would have been a sufficient rebuttal of the presumption raised against her. In this case cohabitation is expressly denied by the petitioner; he testifies unequivocally that for two weeks prior to their separation on the 22d of October he had ceased to share her bed, and on being recalled expressly denies having had any marital relations with her during that time, and particularly on the nights of the 20th and 21st of October.

The defendant, on the other hand, while admitting that her husband occupied a separate apartment from her for two weeks previous thereto, distinctly states that he slept with her in the same bed on the nights of Tuesday and Wednesday, October 20th and 21st, and that he had sexual intercourse with her on Tuesday night the 20th of October. The parties are therefore upon this point in direct antagonism. It is a point as to which it is seldom possible to find corroboration. The question, in the absence of corroboration, must be decided by ascertaining which of the parties is entitled to the most credit. Condonation implies guilt on the part of one, and knowledge of that guilt on the part of the injured. By this defence the wife practically says: "I was guilty of adultery, and my husband, knowing that fact, willingly returned to my embraces." Lord Stowell, in *D'Aquillar* v. *D'Aquillar, 1 Hagg. Ec. 773*, says: "The adultery is almost admitted in the interrogatories by insinuating the defence that the wife was cognizant and had forgiven." The defendant has, however, in this case, under oath, denied that she was guilty; if she was guilty and forgiven, as this defence assumed, she is false in her testimony, and I cannot accord the weight to her testimony, upon this point, that will overcome that of the petitioner, who is not discredited otherwise than by her testimony.

[After examining the testimony as to whether the parties occupied the same bed as defendant testifies, the vice-chancellor proceeds]—

But there is another element necessary to establish condonation, and that is knowledge on the part of the injured one of the offence of the guilty, and this leads us to an examination of what knowledge the petitioner had at the time of this alleged intercourse. Chancellor Green, in *Marsh* v. *Marsh, 2 Beas. 281, 282,* says: "Condonation may be implied if the husband after reasonable knowledge of the infidelity of his wife continues to admit her as the partner of his bed. * * * Reasonable knowledge may be said to have been had when information of a fact is given by credible persons, speaking of their own knowledge, particularly if the same facts be afterwards proved and they become instrumental in the proof" (at *p. 283*), quoting from Dr. Lushington, in *Dillon* v. *Dillon, 3 Curt. 86:* "I have always understood the legal principle to be this, that when a husband had received information respecting his wife's guilt, and can place such reliance on the truth of it as to act on it, although he is not bound to remove his wife out of his house, he ought to cease marital cohabitation with her." Lord Stowell, in *Elwees* v. *Elwees, 1 Hagg. Cons. 269, 292,* says: "A husband has suspicions—he has some intimations—he has enough to convince his own mind, but not to instruct a legal case. In that distressing interval his conduct is nice, and it is difficult to refrain from cohabitation, as the means of discovery would be frustrated; and if he continues cohabitation, it then becomes liable to that species of intimation, which has passed to the disadvantage of this gentleman;" and in *D'Aquillar* v. *D'Aquillar, supra:* "There is no evidence which satisfies the court that she was apprised of it in any other manner than upon general or a probable suspicion, it is not shown she knew it so she could legally prove it." See, also, *Pain* v. *Pain, 37 Mo. App. 110, 115; Hoffmeyer* v. *Hoffmeyer, 7 Paige 60; Uhlmann* v. *Uhlmann, 17 Abb. N. Cas. 236.*

There is no evidence whatever that the petitioner had knowledge of anything more than the floating rumors affecting the re-

lations existing between his wife and Stiles prior to the time the petition was filed, on the 22d of October. It is more than probable that he had no proof of the truth of these stories which he could put his hand upon, or it would have been unnecessary for him to have employed a detective, and place his wife under a system of surveillance, for it does not appear that his suspicions had been aroused with reference to her connection with Kirby until after the report received from the detective. Now, what knowledge did he have as derived from the detective? That he suspected his wife is true—he admits it, and the employment of a detective would prove it. The detective got upon the track of the defendant in Philadelphia on Saturday, the 17th of October, and followed her to the boarding-house of Wenrich ; she went into that house at five minutes past nine in the morning and remained there until twenty minutes past ten. He then followed her around from there to various places and left her at her sister's.

On Monday, the 19th, the detective went to Mrs. Wenrich's, the boarding-house, and saw Mrs. Wenrich, but the evidence of both shows that this visit of the detective was to examine the house, and it does not appear that anything was said between them with reference to the visit of the defendant.

On Tuesday, the 20th, he again followed her and left her in Camden, at her sister's, but she did not go to Wenrich's that day. Later in the day he saw Mr. Graham at Mr. Beldon's office and made a report to him ; exactly what he stated to the petitioner at this time or at any other does not appear, in consequence of the objection of defendant's counsel to evidence being given of what took place between these parties in the absence of the defendant. But it may be presumed, and he says, at one time he did tell him all that he knew, but what did he know ? All that he did know with reference to this charge is, that on the 17th she had gone to various places, including the house of Mrs. Wenrich, and the further information, obtained by him on Monday, that this was a boarding-house, and to all appearances a respectable place, it does not appear that then the detective had even heard of Kirby. There was the all important link yet

Graham *v.* Graham.

wanting, namely, what was the object of defendant's visit to this place, and what did she do while there ?   The visit of a married woman to a respectable boarding-house, although unknown to her husband, might be, and in all probability would be, entirely innocent; no presumption of guilt possibly arises from these conditions alone.

Mr. Graham met his wife that day at her sister's, after seeing the detective; he did not want her to return to Bordentown ; he endeavored to dissuade her therefrom, urging that it would be necessary for her to return so soon to Philadelphia; but she did come back.   She on this occasion upbraided him for having employed a detective to watch her.   With the knowledge which he then had, in the conference between himself, his counsel and his friend Mr. Shreve, it was determined that it was necessary to ascertain the further step indicated, namely, what had been the reason of the defendant's visit to this house of Mrs. Wenrich, and thereupon the engagement was made which resulted in Mr. Shreve's going to Philadelphia with the photograph of the defendant.   This Shreve did on Wednesday ; he there met by appointment the detective, and the two saw and interviewed Mr. Wenrich, who, on the photograph of defendant being shown to him, recognized it as the woman who at his house passed as the wife of Eugene Kirby.   This completed the chain of evidence. Mr. Shreve did not return to Bordentown until late Wednesday night; he did not see the petitioner until Thursday after the defendant had for the last time left her husband's house.   The facts ascertained were reported to petitioner on the morning of Thursday, the 22d, when he immediately closed his house, sent his wife's niece home, and verified his petition for divorce.   So that it appears that reasonable knowledge of the infidelity of the defendant, as defined by the authorities, was not in the possession of the petitioner until the morning of Thursday, the 22d of October, the very day the petition was filed, and there is no pretence that since that time he has had any marital relations with her.

. I am of opinion the petitioner is entitled to a divorce